## ANNE M. BEACH v. CHARLES F. BEACH, JR.

1. DIVORCE—*Extreme Cruelty—What Constitutes* That cruelty which is contemplated by the law as being ground of divorce is the cruelty which renders cohabitation intolerable, which destroys the concord the harmony, and affection of the parties, and renders unsafe the actual existence of the marital relations. The cruelty contemplated by the law must operate upon the husband or wife while living in the relation of husband and wife. It is not upon the individual distinct from the relation that it must operate, but upon the individual while he or she is without fault, and in the proper discharge of the duties which the relation of marriage imposes. Therefore, when a husband wrongfully and without fault on the part of the wife abandoned her, in an action for divorce by the husband, charging extreme cruelty, consisting in accusations made by the wife, in letters written by her to the husband and others, accusing him of criminal intimacy with other women, it appeared that such accusations were made, and letters written, subsequent to such abandonment, and while the parties were living separate and apart, and not sustaining the relation of husband and wife, *held*, that such accusations. under such conditions do not constitute extreme cruelty, to authorize a divorce under the statutes of this Territory.

2. ABANDONMENT—*Cannot Charge Cruelty*. Where a husband has wrongfully driven his wife from home, without any fault on her part, has cast her off, or has himself, without fault on her part, wrongfully abandoned her, he cannot be permitted to have the bonds of matrimony dissolved upon his complaint charging the wife with extreme cruelty, consisting only in words accusing him of wrong doing, where such accusations are shown to have been made only after such abandonment, and while the parties, by reason of the wrongful conduct of the husband, were not living together as husband and wife. Courts will not hold a deserted and abandoned wife to that degree of prudential conduct that she might be held to if under the protection and care of a loving husband, performing the duties and obligations imposed upon him by the status of marriage.

3. CRUELTY—*Elements Of*. At the common law, to authorize a court to proceed to a separation on the grounds of cruelty, there must have been either actual violence committed, which endangered life, limb, or health, or there must have been a reasonable apprehension of such violence. The element of mental suffering, distress, or injury, unaccompanied by violence or an ap-

prehension of violence, was entirely excluded; but the doctrine is now established that, without physical violence, acts or conduct which. operating upon the mind, and, through the mind. upon the physical system, produce bodily hurt, may constitute cause for divorce. With reference to acts of physicat violence, the rule has always been that a reasonable apprehension of bodily hurt was sufficient; but where the conduct complained of operates primarily upon the mind, producing mental pain, it is not sufficient that there should be simply danger that such conduct, thus operating through the mental faculties may produce injury to the physical system or bodily hurt; but it must be shown that such in fact is the effect, or, at the least, that such effect may be reasonably apprehended as the result of the conduct.

4. MARRIAGE CONTRACT--*Dissolution.*   Where the cruelty complained of consists of accusations of infidelity or other violations of marital obligations made by the wife against the husband, though they may not be true, yet. if they were not made from malevolent motives, or through hatred and spite, but were made in good faith, if the wife had reasonable cause for bel eving that they were true, and they were made for the purpose of inducing the husband to abandon such supposed course of wrong-doing, and to return to a proper observance of his marital obligations, they would not constitute extreme cruelty, to justify a dissolution of the marriage.   A wife has a right to .ring to the attention of her husband that which she has heard and which she believes concerning his misconduct. if she does so with a proper purpose and in a proper spirit; and it is his duty, if he is innocent, to endeavor to convince her of her error.   Husband and wife are bound to greater efforts for reconciliation, for removing misapprehension, for allaying quarrels, than are people in any other relation of life.   The marriage status is not a mere contract status, in which each of the parties may be justified in demanding the strict letter of the bond.   It is the status of the law operating upon the weaknesses as well as the strength of human nature, and will not be dissolved except for grave and substantial causes.

5. JURISDICTION—*Plaintiff Must be a Resident in Good Faith.*   The plaintiff in an action for divorce must have been an actual resident in good faith of the Territory for ninety days next preceding the filing of the petition, and a resident of the county in which the action is brought at the time the petition is filed.   Such residence is a jurisdictional fact, that must be alleged and proven by the plaintiff, and must affirmatively appear in the record.   Jurisdiction of the subject-matter cannot be acquired by waiver or consent.   Not only the courts look at the matter of jurisdiction without the question being raised by the parties, but in every case they are bound to inquire whether the facts presented give jurisdiction.

6. SAME—*Proceeding a Nullity.*   Where the plaintiff, who was a lawyer and an author of legal text-books, came to the Territory from the city of New York, where he had a lucrative practice and large income, and had been present in the Territory only during the period which the Statute required to precede the application, remaining the greater part of the time in a county other than the one in which the action is brought, coming to the county in which the action is brought for the first time on the day preceding the filing of the petition, leaving said county on the same or next day, returning for one or two days to attend the hearing of a motion for alimony in the cause, departing immediately, and not again returning until the morning of the day the cause is tried upon its merits; when it is shown that for the remainder of the time

pending the action he is absent from the Territory, and regularly engaged in business elsewhere; where he testified that one object of his coming to the Territory was to procure a divorce, and the facts in the record do not show him to have had any other object; when he brought with him only such personal effects as were necessary for one traveling from place to place or sojourning; where he made no endeavor to establish any business, and had no friends, relatives, or kindred in the Territory or county where the action was brought, or any ties of business or of other nature to bring or keep him there, notwithstanding that he may swear to the contrary the presumption is great, if not conclusive, that his only purpose, in coming to the Territory and to the county where his action was brought was to obtain a divorce, and that he was not a resident in good faith of the Territory or of such county. It follows that the court trying the cause did not have jurisdiction, and that its proceedings were a nullity.

*Error from the District Court of Cleveland County.*

Action by Charles F. Beach, Jr., against Anne M. Beach. From a judgment for plaintiff, defendant appeals. Reversed.

*J. W. McLoud,* for plaintiff in error.

*Green & Strang,* for defendant in error.

The opinion of the court was delivered by

Tarsney, J.: This is an action for divorce, commenced by the defendant in error, Charles F. Beach, Jr., against the p'a'ntiff in error, Anne M. Beach, in the district court of Cleveland county. The petition was filed on the 6th day of April, 1895. The petition was based upon the statutory grounds of extreme cruelty and neglect of duty. There is no specific allegation contained in the petition, or any evidence of neglect of duty, and the allegation relating to extreme cruelty charges such extreme cruelty to consist of accusations made by the plaintiff in error, orally and in writing, to the defendant in error, and by letters written by her to third parties, falsely and maliciously accusing the plaintiff of criminal intimacy with various women.

The parties were duly married on the 26th day of De-

cember, 1882, in the city of New York, and continued to live together as husband and wife from that date until the latter part of August, 1893. The petition charges that during the winter of 1888 and 1889 the said defendant without any cause or justification whatever, and solely for the purpose and with the intent to injure, degrade and ruin the plaintiff, began falsely and maliciously to accuse the plaintiff of criminal intimacy with various women, and has continued such false and malicious charges at frequent intervals to the present time, evincing an unreasoning and morbidly jealous disposition upon her part, which has increased in virulence to the present time; that during the said period of time the said defendant has frequently made false and malicious charges of such criminal conduct on the part of and against plaintiff, both to the plaintiff and divers other persons; and that she has at various times and in divers places annoyed, humiliated, and distressed. the plaintiff, and rendered his life a burden, by persistent spying upon, pursuing, and watching him, and thereby creating the impression that the plaintiff was and is a wrongdoer; that, in pursuance of said course of conduct, the defendant has, within the two years last past, written and sent through the mail to various persons, divers libelous and obscene letters, falsely and maliciously charging the plaintiff and the persons to whom the said letters were addressed, and other persons, with criminal intimacy.

The defendant duly appeared and filed her answer in the action, which answer specifically denied all the material allegations of the plaintiff's petition, and further set forth that on or about September, 1893, the plaintiff, without just cause or provocation, wilfully abandoned the defendant, refused further to live with her as her husband, left her without means of support for herself

and family, she having four children by a former husband, and one, then about four and one-half years old, by the plaintiff; and that plaintiff, from the time of his abandonment to the commencement of said action, had only for a short time contributed anything towards the support of said defendant or her said family.

The cause was tried in the district court for Cleveland county on the 27th day of June, 1895, and judgment was rendered therein on the 29th day of said month, in favor of the plaintiff, and against the defendant. The court found that the allegations in plaintiff's petition were true, and that plaintiff was entitled to the relief prayed for in his petition; that the defendant had been guilty of extreme cruelty towards the plaintiff, and the court entered a decree dissolving the marriage theretofore existing between the parties. It was further ordered by the court that the plaintiff pay to the defendant, as and for alimony in said cause, the sum of $5,000, in installments, specifically directed in the decree.

On the same day, the plaintiff in error filed a motion for a new trial, setting forth twelve causes. The twelfth cause sufficiently sets forth the issues presented by this record which it is necessary for us to review here, and is as follows:

" 12.  Because the plaintiff failed to prove that he was an actual *bona fide* resident of the territory of Oklahoma, and had been for ninety days prior to the commencement of said action; failed to prove that he was a *bona fide* resident of Cleveland county at the commencement of said action, and failed to prove any legal grounds for a divorce; and said decree is contrary to law, and contrary to the evidence, and not supported by sufficient evidence."

This motion was on the same day overruled by the court below, and the cause is duly brought to this court for review.

It appears from the record in this cause that the par-
ties were duly and legally married on the 26th day of
December, 1882, in the city of New York, in the state of
New York, by a minister of the Presbyterian church, and
that they continued to live together as husband and wife
until about August, 1893; that during that time there
was born to them one child, a daughter, at the time of
the trial below about five and one-half years old; that for
the next three years ensuing the marriage the parties re-
sided at Louisville, Ky., where the plaintiff was engaged
in teaching school and practicing law; that they then re-
moved to the city of New York, where the plaintiff con-
tinued to practice law, and was also engaged in writing
numerous legal text-books; that he was successful and
prosperous in his business, and there is no claim upon
the part of either of the parties that their marital rela-
tions were not of the most pleasant and satisfactory char-
acter until some time in 1888 or 1889, when plaintiff
claims that the defendant commenced the course of con-
duct complained of.    The parties continued to live
together as husband and wife until on or about the 28th
day of September, 1893, when it is conceded that the de-
fendant in error abandoned the plaintiff in error, and
further refused to live with her as her husband.

The burden of proof was on the defendant in error to
show that he was entitled to have the marriage dis-
solved.    He must clearly establish by a preponderance
of proof the facts upon which he relies to establish the
legal cause for annulling the marriage.    There is no tes-
timony whatever in the record to show neglect of marital
duty upon the part of the plaintiff in error, except such
as may be deemed to bear upon the charge of extreme
cruelty.    The only facts claimed by the defendant in
error to be proven, establishing extreme cruelty, consist

of accusations on the part of the plaintiff in error that
the defendant in error had been guilty of marital infi-
delity by criminal intimacy with other women. The only
testimony tending to establish the fact that plaintiff in
error had made such accusations prior to the abandon-
ment of the plaintiff in error by defendant in error in
September, 1893, is the testimony of the defendant in
error. He testifies that her conduct towards him was
the occasion of his separation from her or abandonment
of her at that date; that such conduct consisted sub-
stantially in her making false and malicious charges of
marital infidelity; that such course of conduct on her
part began either late in 1888 or in the beginning of
1889; that numberless charges of that kind were made
from time to time from that date until the commence-
ment of the action; that such charges related to him-
self in connection with various women; that he had sev-
eral times talked with her about the matter of these
charges, and protested against them, and protested that
it would be impossible for him to live with her as her
husband if that course of conduct continued; that it was
that course of conduct on her part persisted in that
caused him to separate from her; that she threatened to
go, and did go, to his clients, his partner, and other
friends, and made these charges, and thereby injured
him in his business; that these threats to injure him in
his business were made for the first time in the summer
or fall of 1893; that plaintiff in error, at various times
and divers places, humiliated and distressed the de-
fendant in error, and rendered life a burden to him, by
persistently spying and watching, thereby creating the
impression that he was guilty of wrong-doing; that this
conduct on the part of his wife injured his health, de-
stroyed his business mind, and distressed him beyond

any power of expression, put him in a shape so that he could not sleep, and practically broke down his whole system; that, by reason of the facts stated, he became seriously embarrassed in his finances, became indebted in an amount he could not pay, and thereby his piece of mind was ruined; that she further threatened to make statements, and did in point of fact make statements, that he was financially. embarrassed, that his credit was gone, and thereby did injure his credit.

No letters or other writings by the plaintiff in error are introduced corroborating the testimony of defendant in error as to any of these alleged acts or misconduct on the part of his wife antedating the separation of September, 1893; nor does any other witness corroborate his testimony in these particulars. On the other hand, the plaintiff in error testifies that she did not know that they ever had any quarrels until the summer of 1893; that up to that time he was a very devoted and affectionate husband; that she loved him dearly, and that he always seemed to love her; that he never liked to be away from home; that when compelled to be absent by business he always wished that she might go with him; at home he was very devoted, and that she went with him a great deal on his business trips; that it was their custom during the summer for herself and children to reside in the mountains of New York; that he used to come quite frequently to see them, sometimes once in two weeks, sometimes oftener; that, when they were at a nearer point to the city, he came up every week; that he wrote frequently, and very affectionate letters; that this state of their affections and conduct towards each other continued up to the time of his abandonment of her; that, for a year or two years prior to their

separation, she thought Mr. Beach grew more loving and lover-like; that the last winter before the separation was a particularly pleasant winter; that they entertained their friends a great deal that winter; that the first breach in the relations between them was late in the summer of 1893; that about the beginning of June, she, with her family, went away, as usual, to spend the summer; that there were no differences at that time between them; that she went expecting to return in the fall, as usual, and took her children with her; that Mr. Beach visited them just before the Fourth of July, and stayed over that holiday; that her aunt and mother who were residing with them on that occasion, mentioned to her how fond he seemed to be of her; that was at Stafford, N. Y.; that she remained there until the 1st of August, then went to Prospect hotel, at Catskill; that Mr. Beach went there, and remained there with them the whole month of August, going away, perhaps, a day or two at a time; that while there, Mr. Beach met Mrs. Driscoll, a very attractive woman, and became very much infatuated with her. She states that there and then the first difference arose between them; that the first quarrel or friction in their married life originated there, at that time, She testifies: "I never charged him with infidelity with Mrs. Driscoll. I merely thought he was in love with her, and it caused me great mental distress. I talked with him, of course, somewhat about it. When I left him in the mountains, I left him very heavy-hearted. I knew he was very much attracted to her, and naturally, after we got to Stafford, I noticed a change in his letters at once. They were unlike any letters I ever received, and, while he did not speak of anything in particular, I knew there was something wrong. After I had been there several weeks, I took a trip to the city to see him.

He put me off, and acted indifferently, and made me go right back. The following Thursday, the 28th of September, I got the letter from him which is filed in my answer, in which he says he can no longer live with me."

Charlotte E. Van Loan, a sister of the defendant, testified that she had lived with Mr. and Mrs. Beach the greater part of the time for the last ten years, in their immediate family, especially during the last six years, and up to the very last month they were together. That during all that time they were a very devoted couple. She never saw any discord at any time, nor anything but the most loving feelings on both sides. They seemed to be a very happy couple, she never heard any complaint during that time on Mr. Beach's part against Mrs. Beach, or from Mrs. Beach against Mr. Beach, not, once.

That she first heard of trouble between them late in December of 1893, She never knew of any complaint being made by Mrs. Beach against Mr. Beach for attentions to other women until after the separation, and in December, 1893; and then, only as to the one woman. That that was the first time she ever heard of any complaint on either side.

Samuel D. Van Loan, a brother of the defendant, a clergyman, testified on behalf of the defendant that he was living in the city of New York from 1889 to 1892; that he saw the plaintiff and defendant on an average of about once a week, and took dinner there usually in the evening—spent the evenings there during the whole of that period; that during the time the most amicable relations existed between the parties; that the manner of the parties toward each other was more like that of a newly married couple than people married for years—it was extremely affectionate and loving; that there were no signs of discord of any kind; that he never heard either

of them make any complaint of the other; that he never saw any signs that Mr. Beach was discontented with Mrs. Beach in any way; that he never heard Mrs. Beach say anything about Mr. Beach's fondness for any other woman; that he never heard of any trouble between them until the middle of the winter of 1893 and 1894; that he was with Mrs. Beach in the fall of 1893 and winter; knew that Mr. Beach was not then living with his wife, but never until some time in the winter late learned the reason therefor; that he suspected something was wrong between the parties, because Mrs. Beach was very much depressed, did not seem to eat or sleep naturally; that witness supposed it was merely worry about business matters; that she made no complaint or explanation of her troubles until some time in January.

Margaret C. Ballou, a witness for the defendant, an intimate friend of the family, and fully corroborating the previous witnesses as to the relations existing between the parties prior to the separation of September, 1893, testified that as late as February and March, 1893, the defendant in error, in conversation with witness, had stated that Mrs. Beach was the most amiable woman he had ever known; that he was constantly talking to witness about his wife, and saying many admiring things about her; that, in the presence of witness, he would frequently kiss his wife, and tell her how much he loved her; that he never spoke to the witness concerning his wife in any other manner than in admiration and with affection, praising her ability, her devotion, and her housekeeping qualities; that the first she heard of any trouble between the parties was about the 1st of October, 1893; that Mr. Beach telephoned witness to know if he could come up and see her, and have a talk with her; that he came, and told witness that he was going to sell out his

24—IV.

household furniture, and that he was to separate from his wife; that he told witness in the most matter of fact way, that he had made up his mind to separate from his wife; that witness told him she thought he must be either insane or his mind deranged in some way; that it was a terrible shock to her; that plaintiff gave no reason whatever, except that he said, or tried to say, that it was impossible to get along with her, he did not say why; witness tried to draw from him some reason, and he was unable to give any; that the witness talked with the plaintiff two hours at that time, and he made no complaint that his wife had accused him of infidelity or any other offense.

On cross examination the witness stated that in their conversation she said to plaintiff, " Charlie have you no consideration for honor in this matter?"    He answered, "No; none whatever."    Witness testified that she believed, if plaintiff had any grounds for complaint at that time, by reason of their family acquaintances and immediate friendship, he would have told her with the utmost frankness of the fact.    Further, on cross-examination, she said:    " I say under oath that Mr. Beach was as happy and contented a man in his married life as the majority of married men are.    I have had him up there to my house, and talked with him hours long, after this trouble.    I have done everything I could to bring them together.    Mrs. Beach wrote him letter after letter.    She implored him on her knees to come back to her.    In my presence she wept tears after tears—millions of them. She implored him to come back and live with her, if only for public opinion's sake."    Witness testified that she said to the defendant in error, " Charlie, there is a woman in the case; that he simply laughed, and said, ' Oh, you know a great deal too much, Mrs. Ballou.'    He

never denied it. I accused him of a woman the first time, and he laughed, and said, ' Oh, you know too much; I won't even deny it.' "

The testimony of defendant and these other witnesses for the defense as to the general character of the relations existing between the parties, and their conduct toward each other, prior to the separation, tending to show that their relations were more than ordinarily amicable, kind and affectionate, and that there were no quarrels or contentions, or apparent cause for quarrels or contentions, between them prior to such separation, is further corroborated by the testimony of John M. Saunders, a son of the plaintiff in error by a former marriage, who was a member of the family, and by Bridget Murphy, for many years, and up to the very day of the separation, a domestic in the family.

We must conclude from this record that there has been a total failure on the part of the defendant in error to establish by a preponderance of testimony his allegations that prior to the 28th day of September, 1893, when he abandoned the plaintiff in error, there had been any friction in their domestic relations, or that they had quarreled, and his home made uncomfortable to him, or his domestic peace disturbed, or that he had suffered any mental anguish, pain, discomfort, or loss on account of any accusations made against him by his wife, or any charges made by her that he had failed in his marital obligations, or had been intimate in an improper sense with other women, or that she had interfered with his business, and caused him loss or damage by reason of any accusations. We cannot believe from the weight of the testimony in this cause that any such accusations had been made, or even thought of, by the wife, until immediately preceding her abandonment. The burden

of proof was upon the defendant in error to establish these charges.    The overwhelming preponderance of the testimony is that they were groundless.    If more was needed to induce this conclusion, we find it in the express declaration of defendant in error himself, in a letter which is a part of the record, written by. him to his wife on the 28th day of September, 1893, announcing his purpose to no longer live with her as her husband. Said letter is as follows:

" New York, Wednesday,————, 189—.  (This blank is supplied by other testimony in the record, and fixes the date of this letter as. of September 28, 1893.)

"ANNE:    These are, as Shakespeare says, 'some of the saddest words that ever blotted paper.'    I have nerved myself this evening to write you a confession—to tell you what for many a long day has been in my heart, and which I ought to have told you long ago.    I have struggled against it, but it is here, and a fact, and I can no longer deceive myself or you.    I am wholly unworthy of your love.    I never realized it so much until the past few weeks, when you have written me those beautiful and touching letters, which have only served to emphasize my heartlessness and wrong doing.    I am very guilty, and have done you a grevious wrong.    I do not love you any longer as a husband should love his wife. I feel very tender of you, and very sorry, sorry for you; but there is in my heart no response to the tender, loving things you have lately said and written to me, and I will not longer go on in the wretched mockery of trying to make you think I care for you in a lover-like way, when I do not.    You have worn out all my love.    It is not all or greatly my fault that my heart has wandered away from you.    You have not been sympathetic of my higher and better self.    You care nothing for my intellectual life, and I have been as lonely in my own home—bed and dinners and chairs aside—as though I had been in the desert.    My love for you is dead.    I will not mark you with a counterfeit.    We can never live together

again.   It would be a shameful travesty on a husband's love for me to consent to it.   Let us separate, and each go our way in peace, without making each other's life more miserable than otherwise it would be.   I shall always care for you, and minister of my substance to your wants, but your husband I can never be again.   I am no more responsible for the impulses and emotions of my heart than I am for the recurring of the tides. After a great heart struggle and a long consideration, I am sending these sad lines.   I have only one last word of request for you:   Don't tell your dear children of what this letter contains.   Don't poison Amy and Alice —my two dear daughters both equal in my heart's love—against me.   Let Amy, dear heart, love me as much as ever, as her 'dear papa,' and teach Alice to love me better than she does now.   Don't tell the boys. Don't tell any one.   And now, my own dear girl, think as kindly of me as you can, and understand somehow the heartache that goes with this letter.   Don't think I cast you off.   I will care for you and the children.   This of course.   Don't try to see me.   That will only make the sore bleed the more.   When the house is rented, I will go out, and you can come and get all your things, and I will take care of what is left.   When time has done its work in healing the wound these cruel lines will give you, I will come and see you and the children, and we shall do all we can to make the future comfortable and happy.   Don't worry for me.   I have never been worthy of your love.   I am not worthy of it now.   Don't ask me for more.   God bless you and comfort you.   God keep you always in the peace and happiness you so well deserve.

"CHARLES F. BEACH, JR."

This letter must be held to completely exonerate the plaintiff in error from any charges alleged which antedate its writing.   Were the testimony of defendant in error true, that prior to that time his wife had accused him of infidelity, had published it to others, had, in her anger thereat, endeavored to destroy his business and

injure him in other respects, and such conduct on her part was the cause of his abandonment of her, that fact would have been stated in this letter. Had he any excuse for such abandonment, he would have, at least, attempted to deceive himself into a justification of his contemplated act, if he could not deceive others. He would have used these accusations—these complaints of hers; the fact that they had made his life miserable and had destroyed the peace and concord of his marital relations. He would have sought to justify himself for the act he was about to commit by throwing some of the blame upon her. But this letter is not a letter of accusation. There is not within its lines the suggestion of a fault committed by her. "I have nerved myself this evening to write you a confession. * * I am unworthy of your love. * * I have never realized it until the past few weeks. * * Your letters have only served to emphasize my heartlessness and wrong-doing. * * I do not love you any longer as a husband should love his wife. * * I am very guilty, and have done you a grievous wrong. * * I feel very tender of you, and very sorry, sorry for you; but there is in my heart no response to the tender, loving things you have lately said and written to me. * * My heart has wandered away from you." And why? Because she had been accusing him of crimes he had not committed? Because she had charged him with infidelity to his marriage vow, thus doing him a wrong—the greatest of wrongs to a sensitive nature? No; these are not charged here as an excuse. The only suggestion of fault upon her part is that she "cared nothing for his intellectual life." Had the charge he now asserts been true, would he have closed that letter, "God keep you always in the peace and happiness you so well deserve?" However

this letter might be charactertzed, it cannot be construed as justifying the defendant in error for abandoning his wife on the ground of the charges contained in his petition in this cause. It is a complete refutation of such charges so far as they relate to the period when these parties dwelt together as husband and wife, and, placed side by side with his testimony in this cause, does not show him to be entitled to that degree of credit which would authorize a court to take his uncorroborated testimony against the testimony of a half dozen witnesses, who, at least, have not furnished the substantial data for their own impeachment. We must therefore conclude that, if accusations of infidelity were made by the wife against the husband, they were made subsequent to her abandonment by him.

Certain letters are introduced in evidence by the defendant in error, as also the deposition of one George Gascoigne, to prove such accusations made by the wife subsequent to her abandonment. The defendant in error testified that she had written defamatory, scandalous, and obscene letters, and that she had attempted to spy upon his movements. And the witness Gascoigne, who was a private secretary for defendant in error, a boy of 21 or 22 years of age at the time of the occurrances, testified that, in his capacity of secretary, he often visited the home of the parties; that some time in 1893 he observed for the first time that there was a breach in the domestic relations of the parties, and since that time they have, to his knowledge, lived very unhappily; that they have been living apart; that one day witness called at the house, shortly before the separation; that plaintiff in error then told him that Mr. Beach had not treated her well: that "about the summer of 1893 I called, in accordance with her request, one afternoon, at the Hotel Endicott,

where I met Mrs. Beach and a familiar friend of hers, a Mrs. Ballou, and they talked to me about Mr. Beach the whole afternoon. She stated to me that Mr. Beach had admitted to her that he had been intimate with other women. Mrs. Beach requested me to keep her informed as to certain of Mr. Beach's matters without his knowledge. At this particular time Mrs. Beach made these positive statements: That Mr. Beach told her he had been intimate with other women; that he was at that moment traveling about the country with a woman and that she believed he was crazy."

It may as well be here stated as elsewhere that this testimony of Gascoigne is directly contradicted by both Mrs. Beach and Mrs. Ballou so far as it relates to any accusation upon the part of Mrs. Beach that her husband had been criminally intimate with other women; and it would appear from the testimony that the witness, Gascoigne, was mistaken as to the time of the interview at the Hotel Endicott; that it was not prior to the separation, but subsequent. This is not only shown by the direct testimony of Mrs. Ballou and Mrs. Beach, but it is shown by the fact that Mrs Beach was not at the Hotel Endicott until she was taken there by Mrs. Ballou, after she had been abandoned 'by her husband, and that the abandonment occurred in September, and the letter to the witness, Gascoigne, from Mrs. Beach, requesting him to call at the hotel, was dated November 10. This letter referred to by witness does not bear out the theory that Mrs. Beach desired to employ the witness, Gascoigne, as a spy upon the movements of her husband, or that there was any improper motive or purpose on her part in writing it, or in her desire to meet him. The letter is as follows:

" 1022 Lexington Avenue, Nov. 10, 1893.

" MY DEAR GEORGE: You don't know what a comfort it is to me to know that you are with Mr. Beach. I know you like him, and are loyal to him; but you can be my friend without any disloyalty to him, for you know how fond I am of him, in spite of the wrongs he would do me. I should not, I suppose, have taken you into my confidence, only there seemed to be no other way to get news of him. He will not write to me about himself, and I must know, or I cannot stand it. I told Mr. Beach what you had said about staying with him, because you liked him. It pleased him very much. George, I cannot tell you how much I thank you for your promise to write to me, and tell me the things I want to know. I want to know how he is in health and spirits, how his business prospers, and anything you think I would like to know. Tell me how often he gets letters from New Orleans. George, if we could only save him from making this terrible mistake ! He is on the road to ruin, unless he can be made to see the wrong he is doing both himself and me. I am a little stronger, but I do not know how long it will last. I am so unhappy. Write me whenever you have anything to tell me that you know I would wish to hear. I hope you do not think it too much trouble. Sincerely, your friend,

" A. M. BEACH."

The other letters claimed by counsel for defendant in error to be incriminating, and to substantiate the charge of cruelty, are four in number; one dated July 22, 1894, addressed to Mrs. N. A. Van Loan, the sister-in-law of the plaintiff in error ; one addressed to the defendant in error; one to Mr. Chas. Driscoll; and one to the Binghampton Wagon company, the employer of said Driscoll—all written by the plaintiff in error. Mrs. Van Loan, although the sister-in-law of the plaintiff in error, is one of the women with whom defendant in error alleges his wife charged him with criminal intimacy. Her husband, Mr. Van Loan, was at the time the letter

was written confined in an insane asylum. Mrs. Beach had visited him. He was her brother. On her return from the insane asylum, she wrote the letter to her sister-in-law, from which, passing over certain preliminaries and speaking of her brother's condition, we quote as follows :

" Now if you still care for John and desire his recovery, I think you can do him more good than any one, for I think his love for you is now the cause of his insanity. The relations you have had with Charles has caused him great mental distress, and, when he heard that he had separated from me, he at once came to the conclusion that you were the cause of it, and his mind could bear the strain no longer. You possibly may think the same thing. So, if it is any comfort for you to know it, you are not in the slightest degree responsible, only so far as such clandestine intimacies serve to win a husband's love from his wife. Another woman, whom we met at Prospect last summer, and with whom he became so infatuated that he wanted to get rid of me, and she was to get rid of her husband, and they had a well-defined plan to marry each other. She has recognized her own folly, and gone back to her husband. Charlie tried to get a divorce from me, but has failed. * * I am very thankful that I knew nothing of his relations with you until after our separation. I never dreamed of it, although I had hints and insinuations which I would never listen to. I believed that my husband loved me with all his heart. He seemed devoted to me. We never had a word about any woman, least of all you; yet I believe he told Lando that I made him miserable with my jealousy, and so on. That is not in the least true. He never gave me cause for jealousy that I knew of, and I was one of the happiest women on earth, for I loved and trusted my husband implicitly. I did not dream that he would take advantage of the unprotected condition of my brother's wife, or that she would for one moment listen or respond to such advances. Now, I am not going to reproach you, for it is a thing of the past, I hope ; and I suppose if it

had not been you, it would have been some other woman; and you must now suffer remorse enough without any adding to it, for I don't think you are a woman to do wrong and not suffer for it in the end. You must have known you were doing wrong when I knew nothing of it, and when you thought Charlie was in love with you, and sought your society for no good purpose. He told me after your separation that he had been going out with a married woman all the winter before; that he had been criminally intimate with her; that he did not care for her, but had a good time. Of course, he did not tell me her name, but I suppose now you were the woman; only I hope he said what was not true when he said you were both unfaithful to your marriage vows. I don't believe that part of it. I believe you were imprudent and wrong, but not criminal. * * Keep yourself pure in thought and action for the sake of your future, for your dear children's sake. Never be ashamed to look into their pure little eyes. Never do anything to disgrace your motherhood. I say this with no personal feeling or spirit of censure. I have no ill will toward you. I only feel sorry from my heart for it all, for your sake, for John's sake. The blame rests mostly with Charlie, I know. I have suffered too much, have been too utterly broken-hearted, to have any place for petty feelings of any kind. I have only pity in my heart for your trouble, sorry for the mistake that has grown out of your trouble, and the hope that it may do you no harm, and that you may have a happier future than I can look forward to. Now that Charlie has lost this woman, it is just possible he may write to you again, and seek to renew his relations with you. I hardly think that possible, but, if he does, don't, I beg of you, answer or have anything to do with him, for the sake of your reputation. * * If your imprudence has really done this thing, does it not teach us that wrong brings its own punishment? Now, Minnie, don't fret about the past, but take up the burden of life again, as I shall have also to do, and do the very best you can. Do what is right from

day to day, and God will comfort you and help you, and give you happiness yet.    Affectionately,

"ANNE."

The letter to her husband dated August 16, 1894, so far as it relates to the petition in this cause, is as follows:

"I speak now from no personal feeling, but for your own protection, to warn you, so that it may be a guide to your conduct in the future.    I think of you only as Alice's father, and I do not want certain things ever to come to her ears; and because of what you have done for Amy, and been to her in the past, I do not want her to think too badly of you.    I know now of your relations with my brother's wife.    I have known it only within a few weeks, and I suppose she must be the woman you told me of.    It has caused John's insanity, I feel sure. I did not intend to speak of it to you.    I did not expect to write to you again, but, knowing that you were seen in her home lately, I naturally concluded you were seeking to renew those relations, and, for Alice's sake, I beg of you not to be seen with her again.    It is too unnatural, too disgraceful, to think of.    There are enough women in the world.    Don't come so near our doors. Who would have thought you would have turned out to be such a sensual libertine?    Intellectual men seem fitted for better things.    Can this be your real nature, or how have you gone so wrong?    I just had a letter from a lawyer in New York, who says to me:    'Learning that you are in quest of evidence to procure a divorce from your husband, Chas. F. Beach, Jr., I beg the liberty of addressing you.    I have eye-witness evidence of responsible parties which will secure you an absolute divorce upon statutory grounds without any difficulty.    If I can be of any assistance to you kindly advise me by return mail, and I will be pleased to communicate with you. Awaiting your reply, I beg to subscribe myself.'    (I suppose it must be from a lawyer, although it does not say so.)    I withhold the name of the lawyer, but this is the second one who has written to me offering his services.

Of course I know they are men of no repute, who are looking out for such things all the time, but it shows the notoriety you are getting.   The first one I paid no attention to.   This one I thought at first to turn over to Mr. Thacher to answer, but I dislike to let him know anything more about you.   It is a queer thing to ask of you, but should I answer it or let it go?   I shall not need his assistance if I ever want to get a divorce, but I should think it better to let him know our differences had been adjusted.   Surely, such things must do you harm in a business way, and that is now of interest to me.   Why can't you lead a decent life?   I want to believe your love for Amy and Alice is pure and sincere, but you cannot expect to lead the life of a libertine, and at the same time enjoy the love and society of two such pure little souls. Such love, such companionship, ought to satisfy any man.   You cannot have both.   Make up your mind to lead a decent life, or give up your children.   I inclose Alice's letter.

"ANNE M. BEACH."

The third was addressed to Charles Driscoll, was simply a request to let the writer know where his headquarters were that winter, and whether he would be in New York state, in the neighborhood of Kingston, in the near future, stating that the writer would like to see him on a matter that concerned them both, and would meet him at Kingston at any time; signed, "A. M. Beach." The fourth was a letter to the Binghampton Wagon company, asking them to inform the plaintiff in error whether Charles Driscoll was in their employ, and where he made his headquarters when not traveling, and stating that she had sent a letter to him in care of Columbus Buggy company, which they informed her was forwarded to him in care of Binghampton Wagon company.   She further stated that she desired to communicate with him, and would be obliged if they would give her any information concerning him that would help her to do so.

This was all the correspondence relied upon to establish the accusations of criminal intimacy, which it was contended would establish the charge of extreme cruelty. These letters were all written subsequent to the abandonment of the plaintiff in error by the defendant in error, and while they were living separate and apart. The question presents itself here, upon the threshold of this branch of the case, if these letters sustained the charge that plaintiff in error had accused the defendant in error of criminal intimacy with other women, and if such allegations constituted the extreme cruelty contemplated by the law as a cause for divorce, should they be held to constitute such cause for divorce when written while the marriage relation was not subsisting in fact? That cruelty which is contemplated by the law as being ground of divorce is the cruelty which renders marital cohabitation intolerable, which destroys the concord, the harmony and the affection of the parties, and renders unsafe the actual existence of such marital relations. Can it therefore be said that that can be destroyed or rendered intolerable that does not exist?    The defendant in error in this cause had, before these letters were written, withdrawn from that status which the law establishes for the married relation.    He had himself, as far as it was in his power, and as actual fact, dissolved the marriage.    These accusations upon her part, if established, could not affect, then, the pleasure or happiness which it was his right to enjoy under the relationship of husband and wife, because he had himself abandoned whatever of contentment and happiness there might have been in that relation.    The cruelty contemplated by the law must operate upon the husband or wife while living in the relation of husband and wife.    It is not upon the individual distinct from the relation that it must operate, but

upon the individual while he or she is without fault, and in the proper discharge of the duties which the relation of marriage imposes.

We do not think a case can be found in the books where a husband has wrongfully driven his wife from home, without any fault upon her part, has cast her off, or has himself, without any fault upon her part, wrongfully deserted or abandoned her, and then been permitted to have the bonds of matrimony dissolved upon his complaint of cruelty upon her part, consisting only in words of accusation. A plaintiff in divorce is not only required to prove such wrongs committed by the respondent as constitute a legal cause of divorce, but he must also allege and prove that he is himself without fault; that, from the time of the marriage to the commencement of such proceeding, he has at all times faithfully performed all of his marital duties and obligations towards the defendant. Mr. Bishop, in his work on Marriage, Divorce and Separation, § 343, quoting from Lord Stowell, says:

"The doctrine has its foundation in reason and propriety. It would be hard if a man could complain of a breach of a contract which he has violated; if he could complain of an injury when he is open to a charge of the same nature. It is not unfit, if he who is the guardian of the purity of his own house has converted it into a brothel, that he should not be allowed to complain of the pollution which he himself has introduced; if he who has first violated his marriage vows should be barred of his remedy. The parties may live together, and find sources of mutual forgiveness in the humiliation of mutual guilt. They are suitable and proper companions."

The same author, § 344 of the same work, says:

"Though thus the defense of recrimination is shown to have come to us legitimately and from a high source,

this historical view is of little consequence, for the doctrine adheres and is firmly fixed in our common law and equity system or jurisprudence. A view adequate to our present elucidation is that, extending through our entire law, yet variously modified according to the particular issue, there is a rule which forbids redress to one for an injury done him by another if himself in the wrong about the same thing whereof he complains; and it will not avail the plaintiff that he is less in fault than the defendant. He must come into court, as the expression is, with clean hands."

It being made to appear conclusively by this record that, from the date of the marriage to the date of the abandonment of plaintiff in error by the defendant in in error (a period of eleven years), the relations of the parties had been more than ordinarily amicable and proper, and that such abandonment was wholly the fault of the defendant in error, this court will not hold the deserted and abandoned wife to that degree of prudential conduct that she might be held to if under the protection and care of a loving husband, performing the duties and obligations imposed upon him by the status of marriage. We think, therefore, that if the charge in the petition that plaintiff in error had accused defendant in error of infidelity to his marriage vows by criminal intimacy with other women were clearly established, when it appears that such accusations were made while the parties were living apart, because of the wrongful abandonment by the defendant in error, such accusations would not constitute that cruelty contemplated by the laws of this Territory as a cause of divorce. But, waiving the proposition that that which would constitute cruelty while the parties were living together as husband and wife would not constitute cruelty where they were living separate and apart, we will consider the case as presented by counsel for defendant in error, and inquire

whether the proof in this case shows such cruelty as is contemplated by law, even though the parties were living together when the letters complained of were written.

What is the meaning of the term "extreme cruelty" under our Statutes? And what will constitute a case justifying a dissolution of the bonds of marriage for that cause? It is much more difficult to determine what will constitute extreme cruelty within this statute than it is to determine what will not. No exact definition of this phrase is found in the books. Under the practice in England and nearly all of the states of the Union the issues in divorce cases are tried by the court, without the intervention of a jury, and the conclusions are necessarily always a combination of both law and fact. No two cases hardly ever corresponding, or being in all respects similar, the adjudications, although numerous, have not yet evolved any definite and distinct definition of what constitutes extreme cruelty, although cruelty has, since the foundation of divorce procedure, been recognized as a cause for the dissolution of marriage.

Mr. Bishop, in his work on Marriage, Divorce and Separation, §§ 1530 and 1531, says:

"Widely known as this matrimonial offense is, and much as it has been considered by the courts, they have been cautious about giving it an affirmative definition. Lord Stowell, Sir John Nicholl, and Dr. Lushington severally declined such defining, deeming it more safe not to travel much beyond negative descriptions. Some of our own judges have been of the same mind.

"Section 1531. Cruelty is not unfrequently said to be any actual violence endangering life, limb, or health, or conduct creating a reasonable apprehension of such violence, but there are forms of physical injury involving no violence, actual or apprehended; and we shall see that one of these is equally legal cruelty. Moreover, the danger must be adequately serious."

25——IV.

To approximate an understanding of the latitude and meaning of this phrase as now applied in our statute, we must consider the history, development, and evolution of the law. The case of *Evans v. Evans*, 4 Eng. Enc. R. 310, decided by Lord Stowell in 1790, has by all courts been considered the most able exposition of the law relating to cruelty as a cause of divorce in England at that time, and as correctly embodying the doctrine then laid down by the courts, and may be thus stated: There must have been either actual violence committed, attended with danger to life, limb or health, or there must have been a reasonable apprehension of such violence. The element of mental suffering, distress, or injury was entirely excluded. The eminent judge in *Evans v. Evans*, says:

"What is cruelty in the present case it is hardly necessary for me to define, because the facts here complained of are such as fall within the most restricted definition of cruelty. They affect not only the comfort, but they affect the health and even the life of the party. I shall therefore decline the task of laying down a direct definition. This, however, must be understood: That it is the duty of courts, and consequently the inclination of courts, to keep the rule extremely strict. The causes must be grave and weighty, and such as show an absolute impossibility that the duties of the married life can be discharged. * * * What falls short of this is with great caution to be admitted. * * * What merely wounds the mental feelings is in few cases to be admitted when not accompanied with bodily injury, either actual or menaced. * * * Still less is it cruelty where it wounds, not the natural feelings, but the acquired feelings, arising from particular rank and station, for the court has no scale of sensibilities by which it can guage the quantum of injury done and felt; and therefore, though the court will not absolutely exclude considerations of that sort when they are stated merely as matter of aggravation, yet they cannot consti-

tute cruelty where it would not otherwise have existed.
*   *   *   In the older cases of this sort which I have
had an opportunity of looking into, I have observed that
the danger of life, limb, or health, is usually inserted as
the ground upon which the court has proceeded to a sep-
aration.    The court has never been driven off this ground.
I have heard no one case cited in which the court has
granted a divorce without proof given of a reasonable
apprehension of bodily hurt."

Mr. Bishop, § 1534, after citing the case of *Evans v.
Evans*, and the rule therein stated, says:

"Within this rule, most of our statutes authorizing
divorce for cruelty are interpreted to mean simply and
only the cruelty which in England was ground for
divorce from bed and board when our country was set-
tled."

And then the learned author adds, § 1547:

"In England and most of our states the doctrine, to
which not an exception could easily be found, is abund-
antly established that the apprehended harm must be
bodily, including detriment to health, in distinction from
what is endured only by the mind, or mere mental suf-
fering."

The strict doctrine laid down by the English courts,
and for a long time followed by nearly all the courts of
this country, has undergone some material modifications,
and its harshness has in some degree been abated, not only
by adjudication, but by legislative enactment; and now
it may be considered as established, not only by the
courts of this country, but also those of England, that
the offense of cruelty may be committed without phy-
sical violence, by means of acts operating upon the
mind, but not to the extent of eliminating the element
of physical hurt, but on the theory that injury to the
mind may and does result through mental operation
upon the physical structure.    Mr. Bishop, § 1548, com-
menting upon the old rule of the English courts, says:

"In explanation of this rule, it is admitted that mental pain may be heavier and harder to bear than bodily, and that an ill-disposed husband can create in an affectionate and sensitive wife more misery by force of conduct addressed only to the mind than if, it fits of anger, he were to inflict occasional blows upon her. To this objection the answer from the bench is that in such a case the court has no scale ·of sensibilities by which it can guage the quantum of injury done and felt; according whereto, the rule rests, not on justice, but on the difficulty of making proof, and the lack of judicial discernment—not the firmest foundation for a practice of withholding what justice confessedly demands, in cases where the proof does not fail, and there is no judicial doubt of what the effect should be. Yet under our doctrine of *stare decisis*, with no help from a statute, a practitioner could not expect his court to overturn what has thus for ages been established in our unwritten law, while at the same time he might hope that gradually the stream of adjudication may be so deflected as to wear away something from the border."

This aid which the learned author hoped might be obtained to wear away the restrictions of the common law has been extended, and in many of our states, not only cruelty as defined by the courts is now made a cause of divorce, but in addition thereto, and to meet the objection of narrowness in the common law rule, a new cause of divorce has been created, viz: indignities which rendered the condition of the opposite party in the martial relation intolerable; and under these statutes it is held that mental suffering resulting from such indignities may alone be sufficient to warrant the divorcement. Even without such statutes, many of our courts have modified the rule of the common law, and hold that the words "cruelty" or "extreme cruelty" embrace acts which, operating upon the mind, and, through the mind, upon the physical system, producing bodily hurt, may

constitute cause for divorce. The rule is stated by Bishop, (§ 1563,) thus:

"Under more enlightened physiological views, the legal doctrine has become settled, it is believed, everywhere, that conduct which produces pain of mind is legal cruelty; so that whenever, operating either alone or in combination with something else, it creates a danger to the physical health, a divorce for it or the combination will be justifiable."

We think the rule as thus stated is broader than is justified. With reference to acts of physical violence, the rule has always been that a reasonable apprehension of bodily hurt was sufficient; but where the conduct complained of operates primarily upon the mind, producing mental pain, it is not sufficient that there should be simply danger that such conduct, thus operating through the mental faculties, may produce injury to the physical system or bodily hurt, but it must be shown that such is in fact, the effect, or, at least, that such effect may be reasonably apprehended as the result of the conduct. In a well-considered case, the Pennsylvania court of common pleas employed the following language:

"A husband may, by a course of humiliating insults and annoyances, practiced in the various forms which ingenious malice could readily devise, eventually destroy the life or health of his wife, although such conduct may be unaccompanied by violence, positive or threatened. The courts intervene to dissolve the marriage bond under this head, for the conservation of the life or health of the wife, endangered by the treatment of the husband. The cruelty is judged by its effects not solely from the means by which those effects are produced. To hold absolutely that the wife has no legal protection against any means short of these which he may resort to, and which may destroy her life or health, is to invite such a system of infliction by the idemnity given the wrong-doer. The more rational application of the doctrine of

cruelty is to consider a course of martial unkindness with reference to the effect it must necessarily produce on the life or health of the wife, and if it has been such as to injure either, to regard it as true legal cruelty.    *    * This idea, expressed axiomatically, would be no less than the assertion of this principle. That, whatever form martial ill-treatment assumes, if a continuity of it involves the life or health of the wife, it is legal cruelty." (*Butler v. Butler*, 1 Pars. Eq. Cas. 329-344.)

The authorities are too numerous to require citation which hold that no one single act operating mentally is sufficient to constitute cruelty justifying divorce, but that there must be a continuity of such conduct, and many, if not the great majority of authorities, hold that such conduct must be shown to have been induced by malevolence, hatred, or spite; and it is certainly consonant with sound reasoning that if the cruelty complained of consists of accusations of infidelity or other violations of martial obligations, though they may not be true, yet, if such accusations were not made from malevolent motives, or through hatred and spite, but were made in good faith, and based upon conditions which rendered their truthfulness seemingly apparent or probable, and if the party making such accusations, though they were not founded upon truth or fact, yet had reasonable grounds for believing that they were true, and they were made for the purpose of inducing the party accused to abandon the course of wrong doing, and to return to the proper observance of martial obligations, then they would not and ought not to be held to constitute cruelty to justify a dissolution of the marriage.

Applying these rules to the case at bar, we cannot find that the letters addressed by the plaintiff in error to the defendant in error and others, charging him with misconduct, were written with a malevolent spirit, or through

hatred or spite. They breathe in their very language the opposite. They appear to have been written with the motive and purpose of endeavoring to reclaim him from a course of error and wrong doing, and to bring him back to an observance of his martial obligations. They were written under conditions of great provocation, and apparently were from belief in the truth of the accusations made.

For eleven years the parties had lived together as husband and wife, with more apparent concord and happiness than is unually the lot of married people. No clouds had appeared to darken the horizon of their married life until, in August, 1893, the wife, whether rightfully or wrongfully, became impressed with the conviction that her husband had become infatuated with another woman. Within a little more than a month from that time, the husband, without cause, without attempting to assign any cause, but, on the contrary, in the strongest terms stating that there was no cause save his own faults, abandoned the wife and family, without making suitable provision for them. The wife, knowing no other cause for such conduct upon the part of her husband, might well be excused attributing his actions to his infatuation for the woman under whose influences he had so recently apparently fallen. In her distress of mind, under these circumstances not wanting to believe in the truth, which to her was reasonably apparent, but desiring to recall him to duty if he was innocent, wrote to him and to Mrs. Van Loan of the things that were distressing her.

Was this that criminal cruelty which the law punishes by the most cruel of sentences—the dissolution of the most important of all human relations? We think not; especially as we find nothing in this record to show that the de-

fendant in error ever took any steps, even the slightest, to disabuse his wife of any error, if error she was in, concerning his conduct.   To hold what is contended for in this case would be to shut the door against reconciliation where estrangement and separation had resulted from misinformation and error of fact.   The wife had a right to bring to the attention of her husband that which she herself heard or believed concerning his misconduct, if she did so with a proper purpose and in a proper spirit; and it was his duty to have endeavored, if he was innocent, to convince her of her error.   Husband and wife are bound to greater efforts for reconciliation, for removing misapprehension, for allaying quarrels, and smoothing the road to concord, than are people in other relations of life.   The marriage status is not a mere contract status, in which each may be justified in demanding the strict letter of the bond, and from which each may withdraw at pleasure.   It is a status of the law, operating upon the weaknesses as well as the strength of human nature, and will not be dissolved except for grave and substantial causes.

The defendant in error alleges, and claims to have proven, that the conduct of the wife as to him amounted to extreme cruelty; that, because of these accusations made by her, he was subjected to great mental pain and suffering; and that thereby his physical system was affected, and his bodily health impaired.   This fact it was necessary he should allege and prove, in addition to proving the innocence of his own conduct.   Does this record show such proof?   We submit that it would be an extremely sensitive nature that could be so wounded and injured, and to such a degree, by the letters shown in this record, that cohabitation with the plaintiff in error, though for eleven years affording contentment and hap-

piness, could no longer be endured, and that life there-
after would be made unendurable, and bodily health be
destroyed.    Does this record show in the defendant in
error such delicate sensibilities?    The record shows that
though, during the last year prior to his abandonment
of his wife, his income had exceeded $15,000, he has
contributed since such abandonment, for the support of
his abandoned wife and child, but a little upward of
$700, and that for many months he has not contributed
one cent; nor has he in many months even sought to
visit his own child.    The record shows that, long before
these letters or any of them were written, he had en-
deavored, by means and methods not justified by law, to
free himself from the bonds of this marriage; to induce
the plaintiff in error to procure a divorce from him, upon
proofs that he was to furnish of his own wrong-doing.

On the 10th day of November, 1893, the defendant in
error, addressed and mailed to plaintiff in error the fol-
lowing letter:

"NEW YORK, Nov. 10, 1893.

"DEAR ANNE:    The inclosure is what I have in mind to
propose to you.    I am willing—more than willing—to
modify it in any way I can to meet your views.    Please
consider it with care, and, when I am up at the end of
the month, we will talk of it.    I have looked the law up
carefully, and it is all in proper legal shape; but it will
be right for you, if you desire to do so, to consult a
lawyer about it, after we talk it over, and before you
sign any papers.    This secures you the life insurance in
case of my death, and gives you an education for Mark,
and a maintenance for Amy and all of you, and makes
it enforceable against me, as a matter of law."

In this letter was the following inclosure:

"In consideration of your retaining a lawyer, to be
named by me, to obtain a divorce for you from me, and
of your swearing to a complaint in the action, (all the

allegations of which shall be true,) and of your entrusting the control of the action to me, and of your maintaining absolute secrecy until the decree is rendered, and then stating only that a divorce had been had, (which may include showing a certified copy of the decree to any one you please,) and of your good faith in thus facilitating a legal divorce, I will upon my part procure the divorce for you in a legal manner, and at my own costs and expense, without any publicity, and will, upon the retainer and verification of the complaint as aforesaid, and the surrender and cancellation of the agreement, execute and deliver to you a deed of separation in due legal form, binding myself to you and to a trustee, to be named by you, as follows:"

Then following numerous provisions relating to financial settlements between the parties.

Some courts have mildly criticised Lord Stowell's expression in *Evans v. Evans* that "the court has no scale of sensibilities by which it can guage the quantum of injury done and felt" by mental pain and distress; but certainly no court will ever criticise us for saying that we have no scale by which we can properly guage the sensibilities of one who could write such a document as the foregoing. It must be borne in mind that the defendant in error is one reputed learned in the law, who has acquired a reputation as a legal text writer, who has contributed to the legal literature of the country many works. He might well be assumed to know the law and its ethics. He might well be assumed to know that tha document contained a proposition which could only be construed as an intended fraud upon the courts and the law, and the prostitution of his position as an official of the court. Stripped to its disgusting nakedness, when we consider that in New York the only ground for absolute divorce is adultery, it amounted to the plain proposition that he would draft against himself a complaint in divorce,

charging himself with adultery.   It states expressly that
the allegations of such complaint shall be true; retains
for himself the control of the action against himself;
promises to procure the divorce for her against himself
at his own costs and expense, and without publicity; and
for this privilege, he is willing to pay large considera-
tions in money.   In any light we may view this docu-
ment, it shows the writer to be possessed of moral sensi-
bilities that we cannot think are of the delicate and
sensitive nature his complaint implies.   Either he was
the libertine which his wife suspected him to be, or he
was willing to falsely accuse himself of being such, and
have his wife swear to it as a fact.   The excuse, or rather
the explanation, which defendant in error gives to this
remarkable document, is that it was not contemplated
that the divorce therein considered was to be obtained in
the state of New York, and consequently it did not fol-
low that the complaint was to charge the crime of
adultery.   It seems to us that this explanation does not
explain, but deepens the complications with which de-
fendant in error had surrounded himself; for the record
shows that for many years the plaintiff in error has been,
and still is, a *bona fide* resident of the state of New York.
To bring the action for divorce which defendant in error
was endeavoring to undertake in any other state than
New York would require that the wife should swear in
her complaint that she was a resident of such state; so
that the conclusion is that if it was not contemplated
that the proceedings should be brought in the state of
New York, and charge defendant in error with adultery,
it was contemplated that the action should be brought in
some other state, upon some other sufficient cause, but
that the wife should commit the crime of perjury in
swearing that she was a resident of such state.   This

record is pregnant with facts showing the real character of the moral make up of defendant in error.

On the 28th day of September, 1893, he abandoned his wife in New York, and on the 8th day of May, 1894, filed in the probate court in and for "P" county (now Noble) in this Territory, a petition for divorce; that when summons was issued therein and served upon the defendant in that action, she commenced proceedings in the supreme court of the state of New York, by injunction, to restrain defendant in error from prosecuting such divorce proceedings in this Territory, alleging as the principle ground for said injunction, that the defendant in error had wilfully sworn falsely in his complaint therein, stating that he was in good faith a resident of this Territory at that time, and had been such for ninety days prior to the filing of his complaint therein; that, before such action was brought to trial in New York, an agreement was entered into by the parties, and the proceedings for divorce in this Territory and the injunction proceedings in New York were dismissed, and a deed of separation and maintenance was entered into and executed by the parties. The record shows that during all the time the defendant in error claimed to have been a resident of this Territory prior to the commencement of such divorce proceedings, in 1894, and pending such proceedings, he was a *bona fide* resident of the city of New York, was regularly living at hotels in that city, had a regular office, and was there actively engaged in the practice of law.

Notwithstanding the defendant in error has testified in this cause that the course of conduct of which he complains against the defendant had injured his health, destroyed his business mind, distressed him beyond any power of description, put him in a shape so that he could

not sleep, and practically broken down his whole system, impaired his ability to transact business, this court, under the light of all the conditions shown in this record, even should it be inclined in another case to hold such facts as are complained of against the plaintiff in error to constitute cruelty *per se*, would yet require this testimony to be corroborated in some measure before we could take it as established.

We hold that this record does not show, or even tend to show, that the defendant in error was without fault during the existence of the marriage relations between himself and the plaintiff in error. We also hold that this record does not show that the plaintiff in error was guilty of extreme cruelty towards the defendant in error; that the great weight of the evidence was against the finding of the court below, "that the said defendant was guilty of extreme cruelty towards the said plaintiff, and without any fault so far as the plaintiff was concerned, during the existence of the marriage relations between the plaintiff and the defendant." Therefore the court erred in so finding, and in entering judgment in favor of the defendant in error.

As this conclusion would only operate to reverse the judgment of the court below, and remand the cause for a new trial, we are required to examine the remaining point presented by the record, to-wit: that as to the jurisdiction of the district court for Cleveland county to hear said cause, and enter judgment therein.

It is contended by counsel for plaintiff in error that defendant in error was not a resident of Cleveland county at the time of the commencement of this action, and had not been an actual resident in good faith in the Territory for ninety days next preceding the filing of the petition; that, therefore, the court below had no juris-

diction in the action; and that its proceedings were a nullity.

Section 4544 of the Statutes of Oklahoma, of 1893, is as follows:

"The plaintiff in an action for divorce must have been an actual resident, in good faith, of the Territory, for ninety days next preceding the filing of the petition, and a resident of the county in which the action is brought at the time the petition is filed:"

And § 2938 of said Statutes reads:

"An action for divorce must be brought in the county of which the plaintiff is an actual resident at the time of filing the petition."

Counsel for defendant in error contend that "a general appearance and answer to the merits is a waiver to the question of jurisdiction. Residence is a jurisdictional fact, and was improperly raised by the defendant below. By her general appearance and answer, and her personal appearance at the trial, she conceded the jurisdiction of the court, and is estopped from raising it now." (Citing Brown Jur. § 50.)

This proposition is untenable in the sense that it is attempted to be here applied. Counsel lose sight of the fact that jurisdiction partakes of two natures—one over the subject matter of the controversy, the other over the parties. If the court does not possess the legal power to decide the question involved, then jurisdiction cannot be acquired by consent. (Brown Jur. § 47.)

The very section cited by counsel for plaintiff as an authority for that proposition is to the contrary. It says: "While jurisdiction over the subject matter cannot be waived, because the defendant cannot confer power upon the court it does not possess, any matter relating to service of process or form of pleading that

could have been taken advantage of by special demurrer, any question that could have been presented by appeal or argument in proper assignment of error, may be waived." (Brown Jur. § 50.)

It is not necessary that the defendant shall have raised the question of jurisdiction presented in this case. Such jurisciction depended upon the facts necessary to be alleged and proven by the plaintiff. Not only the courts look at the matter of jurisdiction, but in every case they are bound to inquire whether the facts as presented to them give them jurisdiction. ( *Myers v. Berry*, 3 Okl. 612, 41 Pac. 580; Wells Jur. § 62.)

It would scarcely be asserted that jurisdiction could, by consent, be conferred upon courts of admiralty to try an indictment, or that in the federal circuit courts, where jurisdiction depends upon the citizenship of the parties, jurisdiction could be conferred by consent or waiver. If the defendant in error, at the time of the filing of his petition in this cause, had not been an actual resident in good faith in the Territory for ninety days next preceding the filing of said petition, and an actual resident of the county of Cleveland at the time the petition was filed, then the court had no jurisdiction, and its proceedings were a nullity; and the fact of such residence must affimatively appear in the record.

Was, then, the defendant in error a "resident" within the meaning of the statute ? The defendant in error, in his testimony in the cause, stated that his place of residence was Norman, O. T.; that he had been a resident of Oklahoma Territory about six months, and of Cleveland county since about the 1st of April, 1895. The facts appearing from this record show that the defendant came to this Territorry about the last of December,1894, or the first of January, 1895; that he stopped at Perry

a part of the time, perhaps the greater part of the time, until the 5th of April, occupying a furnished room there, and taking his meals at other places; that during a portion of that time he was absent from the Territory, attending to business. He testifies that one object in his coming to the Territory was to procure a divorce.

The facts do not show him to have had any other object. He had no other business, and did not endeavor to establish any other business. He was by profession a lawyer and an author of legal text books; yet he left his library in New York, and did not form or attempt to form any relationship with the practice of law in this Territory, or to acquire any property, or to make any investments, which might show any intent to permanently identify him with the Territory. He had no relation or kindred living here. He brought with him only such personal effects as were necessary to one traveling from place to place, or making a short sojourn.

We cannot be expected to believe that one whose income from the practice of law and from authorship amounted to $15,000 per annum would expect to better his condition financially or intellectually, and obtain greater remuneration in the practice of law, or find more facilities and aids to legal authorship, in Perry or Norman than in the city of New York. In his testimony upon the trial, he claimed that his residence in the Territory commenced about the 1st of January, 1895, thus repudiating any claim to having been a *bona fide* resident of the territory in 1894, although in July of that year proceedings were pending in the probate court of "P" county upon his petition for divorce, in which he had sworn that he was then, and for months had been, a resident in good faith of this Territory, and of that county.

The record shows that on the 5th day of April, 1895, defendant in error went to Norman, in Cleveland county; that that was the first time he had ever been in that county that the next day he filed the petition in this cause for divorce ; that the same day, after filing said petition, or the next day, he left the county · that he returned there on the 31st day of May, to attend the court in the hearing of a motion for alimony in the cause; that he stayed until the next day, and left upon the first train after the motion was heard; that he did not return to the county again until 1 o'clock of the morning of the day the cause was heard upon its merits; that, during the time said cause was pending, he was absent from the Territory, at various places, the most of the time at Indianapolis, regularly attending to business in which he was interested.

From this record we are not satisfied that the defendant in error came to this Territory with the intention of making it his permanent home, or with the intention of becoming a resident in faith, or that he had any other purpose in going to Cleveland county except to institute and prosecute his action for divorce. The conditions surrounding his actually being in the county and Territory, and the facts stated as to his profession and business; the disparity between the facilities for conducting the same in New York or some other large city and those at Norman, in this new Territory; the fact that he had no friends, relatives or acquaintances in Cleveland county, or any ties of a business or other nature to bring or keep him there, with his declaration that one of the purposes of his coming was to secure a divorce—all raise the presumption, almost conclusive, that that was his sole purpose, and that he did not in good faith intend to become a resident of the county. This, supplemented

26—IV.

and strengthened by his own testimony that he was con-
sidering the shipping of his library, then stored in New
York, not to Norman, in Cleveland county, but to Perry,
in Noble county, shows that it was not his intention to
become a *bona fide* resident of Cleveland county.

The case of *Winship v. Winship*, 16 N. J. Eq., 107,
states what we conceive to be the sound principles of law
governing this proposition.   In that case, the husband,
who was defendant, was living in Jersey City in adult-
ery with another woman.   The wife, who was complain-
ant, testified that, when she commenced her suit, she
was living in Jersey City.   She had formerly lived in
the city of New York.   She brought her trunks over to
Jersey City, and commenced living there, some time be-
fore the commencement of the suit.   In this case Mr.
Chancellor Green states the law applicable as follows:

"Admit that the complainant, with her trunks, reached
her lodgings in Jersey City a day or a week before the
bill was filed, does that constitute a residence in this
state, within the meaning of the act of the legislature?
I do not think that she was either an inhabitant or a
resident of this state, within the meaning of the act con-
cerning divorces.   The legislature did not design to
invite the commission of lewdness within the state, nor
to hold out inducements to the citizens of other states to
abandon the appropriate forum for the adjudication of
their wrongs, and seek redress in our courts.   I do not
believe they designed to subject the soil of the state
to such pollution, or her courts to judicature to such
degradation.   I know that the language of the statute
is very broad, and may in its terms embrace the cause
now under consideration; but I nevertheless think that
the legislature was legislating for the citizens of this
state, not for others.   The subject is one of grave import-
ance, and is daily assuming a more serious aspect.   At
this hour a large portion of the divorces asked for in
this court are by citizens of other states, who come into

this state for the mere purpose of obtaining a divorce, and often in evasion of their own laws. There is too much reason to apprehend collusion of parties in actions of divorce in regard to the establishment of a domicile, as well as with respect to the procedure. Conflict of jurisdiction, injury to morals, reproach of our law, oppression and fraud, as well as obloquy to the judicature which must administer the law, are the evident consequences which must follow from the influx of parties from other states to obtain a dissolution of marriage here, in opposition to the rule of their own law."

And in *Whitcomb v. Whitcomb*, 46 Iowa, 437, the plaintiff, who owned a farm in Breamer county, leased the same for the year 1872; reserved one room in the dwelling house, where he kept some ·household goods, his wife being absent in the state of New York, where she had been for several months. A portion of the time after the month of July, 1872, he was at Shell Rock, Butler county, where witnesses testify that he was engaged in the brewery business, in which he had a half interest. They state generally that his residence was there in the fall and summer of 1872. He stated to one of the witnesses that he was staying at Shell Rock in order to claim a residence, that he might procure a divorce. He did commence an action for divorce in Butler country while he was staying at Shell Rock, and a decree was rendered there in December 4, 1892. In that case, on appeal, the court said:

"We think the evidence in this case, instead of ·showing a fixed habitation at Shell Rock, only shows it was a temporary abiding place, selected as an aid in procuring a divorce, and that the commencement of the suit in Butler county was an attempt to impose jurisdiction upon the court in that county which it did not possess."

And the court in that case cites with approval the case of *Hinds v. Hinds*, 1 Iowa, 36, wherein Mr. Justice Wright says:

"A legal residence, not an actual residence alone, but such a residence as that, when a man leaves it temporarily or on business, he has an intention of returning to, and which, when he has returned to, becomes and is *de facto* and *de jure* his domicile—his residene. There must be a fixed habitation, with no intention of removing therefrom." (See, also, *Neff v. Beauchamp*, [Iowa] 36 N. W. 905; *Gourley v. Gourley*, [R. I.] 10 Atl. 592.)

Bishop in his work on Marriage, Divorce and Separation, vol. 2, p. 105, says:

"The true view probably is that the law and proofs of domicile are the same in divorce causes as in others; but, in the actual course of things, the temptation for litigants to practice frauds on courts and juries as to their domicile is so great, and the successful frauds are so numerous, that the constantly awakened vigilance which necessarily attends these hearings will often refuse to be convinced by evidence which would be accepted as ample in causes of a different sort."

In a Massachusetts case, Chief Justice Shaw, says:

"The presumption is violent, if not conclusive, that the husband went to Indiana in order to obtain a divorce. Even if he had other objects in view, if this was one—and his acting upon that is strong proof that it was—it would be within the statute." (*Shannon v. Shannon*, 4 Allen, 134.)

"If a person is applying for a divorce in a state where he has been present only during the period which a statute has required to precede the application, if the *delictum* he relies upon would not authorize this remedy in the state from whence he came, and if he left behind land, houses, friends and business, while he has none in the new state, one will not readily believe that in good faith he has changed his domicile, though he swears to the change. Observers will set him down as an adventurer, away from home, endeavoring by a false representation to get from a cheated court a worthless writing in the form of a divorce decree wherewith to deceive some

unsuspecting woman into a polygamous marriage with him." (Bish. Mar., Div. & Sep. § 103.)

Counsel for defendant in error cites, in opposition to the doctrine of these cases, *Colburn v. Colburn*, 70 Mich. 648, 38 N. W. 607. In that case, the wife, who was defendant, deserted her husband in New York, in November, 1882, and continued to reside in that state, and was residing there at the time of the proceedings for divorce in Michigan. The complainant came to Michigan in July, 1884, and commenced his action for divorce on the 4th day of August, 1885, the statutes of Michigan requiring one year's residence. The complainant testified that he came to Michigan with the intention of permanently residing in that state; that his main purpose in choosing Michigan as his home was to procure a divorce from his wife, as desertion was not a cause for divorce in New York. He left no property in New York, and had none except what he had earned since he came to Michigan The court said:

"We think the evidence clearly shows that the complainant is in good faith resident of the state. If so, it is clearly immaterial what motives influenced him in coming here. And, certainly, the fact that he moved here because he was satisfied with our laws, or wished to receive the benefits of them, should not be used against him to bar him of his rights under those laws."

It will be noted that in that case, though the evidence showed that his purpose in coming to the state was to obtain a divorce, yet the evidence showed him to be, independent of that, in good faith a resident, and the court simply held that the original purpose he had in coming would not destroy a residence otherwise established in good faith.

The case of *Carpenter v. Carpenter*, 30 Kan. 712, 2 Pac. 122, cited by counsel for defendant in error, is not

analogous. In that case the complainant, while a *bona fide* resident of Neosho county, Kan., was appointed collector of internal revenue of the United States for the district of Kansas. The office of such collector was required to be held in the city of Leavenworth, Leavenworth county, Kan., and the duties of the office required the plaintiff's presence in Leavenworth City nearly all the time. The plaintiff went to Leavenworth, and remained there about five years, but at no time had any intention of changing his residence, but at all times considered Chanute, Neosho county his legal place of residence, continued to vote there, and intended to return to Chanute whenever he should cease to hold his office. The court held that the district court of Neosho county had jurisdiction to hear and determine the action of divorce; that the plaintiff was at the time of the commencement of his action an actual resident of Neosho county, Kan., within the meaning of §§ 54 and 640 of the civil code; that those sections contemplated the actual and permanent residence of a party, and not necessarily the temporary and official residence which a party may adopt during the time of his holding a federal position. A different principle was involved in that case from the one at bar.

The case of *Albee v. Albee*, (Ill. Sup.) 31 N. E. 153, 158, shows a suit by husband for desertion; that the plaintiff came to the state two years before he began suit, and with the intention, as he swore, of becoming a resident; and he testified that such had been his intention ever since. The fact that during said time, and particularly during the first year, he was absent most of the time, on visits to his former home, in another state, where his parents resided, was held insufficient to show that he was not a resident of the state for a year before the suit. The decision in that case, while holding that

in the particular case the complainant had been a legal resident, yet sustains the principle of the New Jersey case and others cited, *supra*, the court using this language:

" We are unable to concur with the appellate court in its conclusion that the evidence fails to show that the complainant was a resident of this state for one year next prior to the filing of the present bill.   While there are various circumstances surrounding the case tending to awaken a strong suspicion that his residence here was merely colorable, that his only purpose in coming to this state was to apply to one of our courts for a divorce, and that he came with no *bona fide* intention of establishing a residence in this state, still we are of the opinion that the effect of the evidence in this record is to prove, at least *prima facie*, that for one year prior to the time of the filing of the present bill his legal residence was in Illinois."

We must therefore conclude that the defendant in error was not a resident of this Territory in good faith for ninety days preceding the filing of his petition in this cause, and that he was not a resident of Cleveland county at the time said petition was filed; that the court below had no jurisdiction of the action; and that its proceedings were a nullity.

An unenviable fame has already attached to this Territory by reason of the inducements which her laws have in the past offered for obtaining a dissolution of the status of marriage.   The liberality of the law has been taken advantage of and has been abused.   A large portion of the divorces asked for in our courts were brought by citizens of other states, who came into this Territory for the mere purpose of obtaining a divorce, and imposed upon the courts by perjury and fraud, not only as to the facts of residence, but also with respect to the procedure; thus occasioning injury to morals, reproach to the law, as

well as obloquy to the judicature which must administer the laws. This court, as a conservator of society, of the family, upon which society is founded, of the morals of the people, of the good name and fame of the Territory, owe it to all these that the laws shall not be administered with such laxity and disregard to the intention of the lawmakers as to bring reproach and dishonor upon the people of the Territory, and upon their judiciary.

For reasons stated herein, the judgment of the court below is reversed and this cause dismissed.

Scott, J., who presided in the court below, not sitting; all the other Justices concurring.