BARKER V. BARKER.

No. 251.    Opinion Filed November 9, 1909.

(105 Pac. 347.)

1. **DIVORCE—Grounds—Extreme Cruelty—Mere Incompatibility.** In an action for divorce, where the cause of action is predicated upon extreme cruelty for conduct other than physical violence, either actual or threatened, it is not sufficient that there should simply be danger that such conduct, operating through the mental faculties, may produce injury or bodily hurt to the physical system, but it must be shown that such in fact is the effect, or at least that such effect is to be reasonably apprehended as imminent as a result thereof. And to entitle a party to the remedy of divorcement on the ground of extreme cruelty, it is not enough that the grounds be the result of incompatibility of tastes or temperament or estrangement produced by differences of opinion and conduct growing out of the administration of household affairs, as these must be endured along with the other minor misfortunes of life. They are the things which under the law parties who marry take into consideration on entering matrimony, and divorce will not be granted on their account. The remedy of absolute divorce is an extraordinary remedy for evils which are unavoidable and unendurable, and which cannot be relieved by any proper and reasonable exertion of the party seeking the aid of the courts.

1. **DIVORCE—Grounds—Duty to Bear and Forbear.** Husband and wife are bound to exercise greater efforts for removing misapprehension, allaying quarrels, smoothing the road to concord, and effecting reconciliation than are people in other relations of life. The marriage status is not a mere contract status, in which each of the parties may be justified in demanding the strict letter of the bond. It is a status wherein the law operates upon the weakness, as well as the strength, of human nature, and it will not be dissolved except for grave and substantial causes.

(Syllabus by the Court.)

*Error from District Court, Osage County; L. M. Poe, Judge.*

Action by Mary J. Barker against Ed Barker. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

*Preston A. Shinn,* for plaintiff in error.—Citing: *Beach v. Beach,* 4 Okla. 389; *Robinson v. Robinson,* 66 N. H. 600; 14 Cyc. 598-608; *Carpenter v. Carpenter,* 30 Kan. 712; *Scott v. Scott,* 61 Tex. 119; *Nickerson v. Nickerson* (Ore.) 54 Pac. 277.

*Leahy, Scott & Templeton,* for defendant in error.  No copy of brief reached the reporter.

DUNN, J.    This action presents error from the district court of Osage county.   Mary J. Barker, defendant in error, filed her petition in that court praying a divorce from her husband, Ed Barker.   The cause was submitted to a referee with authority to report findings of fact and conclusions of law, which he did, denying plaintiff's petition.   Exceptions were filed thereto, and on a hearing thereon by the district court the conclusion reached by the referee was reversed, and judgment granting plaintiff a divorce was rendered upon the petition and record returned.   The defendant has brought the case to this court by petition in error and case-made, and we are asked to reverse it.

The petition avers that plaintiff and defendant were married on the 17th day of November, 1899, and lived and cohabited together until the 16th of March, 1906, at which time they separated and have since been living apart; that the separation was brought about by no fault of plaintiff, but by the fault of defendant; that at the time of the marriage plaintiff was the mother of two minor children, and that the defendant has been guilty of extreme cruelty and harsh treatment toward the said children without cause, and over the objection of plaintiff, greatly to her mental anguish and suffering; that he has threatened to drive the children from home so that he would not have them around to feed; that the plaintiff and her children were members of the Osage Tribe of Indians, and were on the rolls, and that defendant received and had the use and benefit of the annuities and other moneys paid them by the Interior Department of the United States, but that, notwithstanding this fact, he would deprive them of the necessities of life; that the money received by plaintiff and the said children amounted to more than $200 *per capita* per year, all of which was used and controlled by the defendant; that in addition to this plaintiff had farms in the Osage Indian reservation, the proceeds of which were used and controlled by the defendant, and yet when importuned by

Vol. 25—4

plaintiff to · ᷂̃ide her and the said minor children with the neces-
sities of ᾿ ᷂ would go into a rage and would not do it, saying
he inter ᷂ save some money for another day, and would remain
in suc¹ .ition of mind for days at a time, and would not speak
to h᷂ ᷂e children; that he denied plaintiff all information with
refer᷂ ᷂ to what disposition he made of the money; that this
treatment and the fear that plaintiff would be separated from her
children and lose their respect and affection caused plaintiff great
mental anguish and suffering, which defendant well knew.

It will thus be seen, the only cause of action which is sought
to be set forth in the petition is extreme cruelty. The evidence in
the case shows the parties were married in Sedan, Kan., in Novem-
ber, 1899, and that no children were born as a result of the mar-
riage, but that plaintiff by a former marriage had four children,
the two older of which at the time of the trial were married; the
two younger being girls, and at the time of the marriage, were of
tender years. That immediately after the marriage the parties,
with the oldest girl, who was not then married, and the two
younger children, moved to Kansas City, Mo., where they lived
about a year. From there they moved to Independence, Kan., and
from there to Cedar Vale, Kan. That prior to marrying plaintiff
the defendant had worked as a hired hand for herself and her
former husband for a period of something like four years, and
after the marriage, while at the different places where they resided,
he engaged in such manual labor as he could get. The plaintiff
and her children had several farms in the Osage Indian reservation,
and of these the defendant became the general overseer, and put
in some of his time in improving, fencing, building houses thereon,
and putting them under cultivation. Some of this work was also
done, under his supervision, by the tenants. In addition to this
property, plaintiff and her children received about a thousand dol-
lars per annum by reason of their membership in the Osage Indian
Tribe, and from the rents on these lands. Precisely what use was
made of all of this money is not shown by the evidence; the plain-
tiff taking the position that defendant received it, and made no

proper accounting to her of the use which he did make of it, and the defendant asserting that the same was expended for property, improvements on the farms, and the living expenses of the family. There is no evidence that he embezzled or appropriated to his own use and kept the payments received by the other members of the household, nor is there any evidence that he was extravagant or wasteful. In fact he was represented as being more than frugal and economical, even to the extent in this regard of being parsimonious or niggardly. There is no assertion or contention that he denied the family anything which he had for himself, but it is in evidence that he complained of the expense off maintaining the family as it desired to live, and that his desire was to save the money received for the future. There is no evidence, however, to sustain a claim that his actions in this regard were such as to leave either his wife or her children hungry, and to deprive them of the things which it was necessary for them to have, although without doubt they desired to spend more money and to live better than he was willing they should, and it is established by the evidence that on these occasions he would sulk and pout about the expenses.

The character of the evidence on this point as given by the plaintiff was as follows:

"Q. During the time he and you lived in Cedar Vale, Kan., what, if anything, did Mr. Barker the defendant do towards providing for you and the children? A. He didn't do anything, and if anything was ever gotten he always grumbled about it. Q. What do you mean by saying he grumbled? A. Well, he got mad at me, and wouldn't talk to me for two or three days at a time. Q. What would he grumble about mostly? A. Mostly what we wore, and what we had on the table. Q. What were some of the things he grumbled about you having on the table? A. Fresh meat, milk, and potatoes. Q. What did he say about the milk? A. He said five cents a quart was too rich for his blood. Q. Did you deprive you the use of milk while in Cedar Vale? A. For a long time he did. Q. Were you sick once when he deprived you of the use of milk? A. Yes, sir. Q. How long were you sick? A. A couple of days. Q. Did you have any physician? A. Yes, sir. Q. Did he tell you why

you were sick? A. He said because I didn't have milk. Q. Did you have milk then? A. Yes; when I got it and raised a fuss about it. Q. About how often would this trouble arise about you providing the necessities of the table? A. Every time he came home. Q. When he got mad and fussed with you how long would he treat you that way? A. Sometimes two or three days. Q. How did that make you feel? A. It made me feel just like I didn't want to live. Q. Did that same treatment continue after you came to Pawhuska? A. It did. Q. What did he say when you bought any clothes for the children? A. He always made a fuss over it, every time I went and got anything. Q. What children are these that you speak of? A. Cleweine and Cora. Q. The two minor children? A. Yes, sir. Q. Now you say these children were members of the tribe, and you were also? A. Yes. Q. Did you have farms? A. Yes, sir. Q. Where did the money come from that supported you and your children? A. From our payment. Q. And did any of it come from the farm? A. Some of it. Q. And it was spending that money that Mr. Barker complained of, was it? A. Yes, sir."

The foregoing presents the evidence submitted by plaintiff, upon which she relies to sustain that portion of her complaint averring extreme cruelty by reason of lack of proper and adequate support, and defendant's personal deportment when the question was raised in reference to the household expenses.

On the other proposition involved the evidence relied upon by counsel and set forth in their brief as given by Mrs. Barker, is as follows:

"Q. How old were these two minor children at the time you married Mr. Barker? A. Cora was 4 and Cleweine was a little past 7. Q. Now, Mrs. Barker, I will ask you how, the defendant treated your children during the last two years that you lived together? A. He was everlastingly finding fault with me and grumbling at them, and he told me that Cleweine would have to leave home before she was 15, and I would always talk to them and tell them that they must be kind to him, and they must respect him and love him. I believe it was Cleweine herself that told me that he had said that to her. Q. You say that Cleweine complained to you that she would have to leave home before she was 15? A. Yes, sir. Q. Did you talk to him about that? A. Yes; and he said if I didn't make my children do better he would do worse than that. Q. He said he would do worse? A. Yes, sir. Q. Now what

effect did that have on your feelings and your health? A. It almost made me sick. Q. Were you afraid that your children would leave home? A. I was. Q. Were you afraid this would occur on account of his treatment of them? A. That was all of it; just his treatment. Q. I will ask you if he ever told you that you would have to decide between him and your children? A. The night we talked over our separation I told him we could not live together in this world the way we had been living, and that I couldn't give up my children, and he said, 'Well, just the children or me.' Q. That happened at the time you separated? A. Yes, sir. Q. You made your final settlement a day or two after that? A. Yes, sir. Q. Did you believe it was necessary in order to keep your children that you should separate? A. I did. * * * Q. When Mr. Barker was talking to you at the time that you were talking of the property agreement and separation, do you know what children he spoke of when he said your children would have to go? A. My small children."

The child Cleweine, who was the minor daughter to whom Mrs. Barker referred on the same matter, testified as follows:

"Q. Did Mr. Barker tell you at any time that you would have to leave home before you were 15? A. Yes, sir. Q. Just go on and tell what he said to you? A. It happened on several occasions. One morning my sister was washing dishes, and I was supposed to wipe them, and he came by me and flipped my ears, and said to me that I had to mind him, or he would see to it that I left home before I was 15. Q. Did he do that on more than one occasion? A. Yes, sir. Q. Did you tell your mother what he said? A. Yes, sir. Q. What did your mother advise you to do? A. She told me to treat him good, and to always respect and love him. Q. How did it seem to affect your mother when you told her what he said to you? A. She would cry, and not have anything to say to us."

The parties were well acquainted with each other prior to their marriage, and from the record it would seem that their stations in life were not materially different. The immediate cause of the separation grew out of a little dinner party given at the house by the married daughter. She had invited in a number of her friends. The plaintiff's grown son was likewise present, and the defendant, after having been solicited by his wife to come in from the garden where he was at work and make an exchange of clothing and prepare for dinner, entered the house and was sitting in

a closet talking with plaintiff, who was crying, when the married son entered. The defendant, as was his custom, was objecting to the expense of the dinner, and plaintiff was assuring him that she had not borne the expense. The married son took part in the controversy, and a physicial encounter ensued between him and defendant. The separation of the parties occurred a few days later.

On the question of her health during the time of her marriage plaintiff testified as follows:

"Q. How was your health about the time you were married? A. Not very good. Q. At the time that you were married, and shortly after you moved to Kansas City, was Mr. Barker good to you? A. For a while. Q. How was your health at the time of your separation and a few months before? A. Not very good. Q. At what time was your health best, at the time you were married, or just before you were married? A. I never did have good health while we were married. Q. Do you think that your health at the time of your marriage was as good as it was at the time of the separation? A. It was a little better of course. After I had been married awhile I got better. Q. You say then at the time of your separation you think it was as good as when you were married? A. Yes; it was."

The foregoing substantially presents the evidence in the case. There is no evidence going to show that the defendant at any time abused the plaintiff, either by physical violence, or by cursing her or by using improper language in her presence. There is no evidence that he ever mistreated the minor children either by whipping them, or by subjecting them to any kind of punishment. The defendant denies all of the facts and conclusions asserted against him by plaintiff and her witnesses, and offers proof for the purpose of showing disposition of the funds, and that he was a good provider, and was not guilty of any of the unkind acts charged. In the consideration of this case, however, his testimony will not be considered; for, if there is evidence in the record reasonably tending to support the judgment of the trial court, it will be sustained, and the question is, Will the foregoing testimony sustain a judgment in this case for absolute divorce on the grounds of extreme cruelty? We think not.

One of the leading cases on this subject is found in the Oklahoma Territory Supreme Court Reports. *Beach v. Beach,* 4 Okla. 359, 46 Pac. 514. The syllabus of that case on the question of the elements of extreme cruelty in our judgment correctly states the law, and we quote therefrom as follows:

"At the common law, to authorize a court to proceed to a separation on the grounds of cruelty, there must have been either actual violence committed, which endangered life, limb, or health, or there must have been a reasonable apprehension of such violence. The element of mental suffering, distress, or injury, unaccompanied by violence or an apprehension of violence, was entirely excluded; but the doctrine is now established that, without physical violence, acts or conduct which, operating upon the mind, and, through the mind, upon the physical system, produce bodily hurt, may constitute cause for divorce. With reference to acts of physical violence the rule has always been that a reasonable apprehension of bodily hurt was sufficient; but, where the conduct complained of operates primarily upon the mind, producing mental pain, it is not sufficient that there should be simply danger that such conduct, thus operating through the mental faculties, may produce injury to the physical system or bodily hurt; but it must be shown that such in fact is the effect, or, at the least, that such effect may be reasonably apprehended as the result of the conduct. * * * Husband and wife are bound to greater efforts for reconciliation, for removing misapprehension, for allaying quarrels, and smoothing the road to concord than are people in any other relation of life. The marriage status is not a mere contract status, in which each of the parties may be justified in demanding the strict letter of the bond. It is the status of the law operating upon the weaknesses, as well as the strength, of human nature, and will not be dissolved except for grave and substantial causes."

It was likewise said in *Carpenter v. Carpenter,* 30 Kan. 744, 2 Pac. 144 (46 Am. Rep. 108) ;

"It was formerly thought that to constitute extreme cruelty, such as would authorize the granting of a divorce, physical violence is necessary; but the modern and better considered cases have repudiated this doctrine, as taking too low and sensual a view of the marriage relation, and it is now very generally held, that any unjustifiable conduct on the part of either the husband or the

wife, which so grievously wounds the mental feelings of the other, or so utterly destroys the peace of mind of the other, as to seriously impair the bodily health or endanger the life of the other, or such as in any other manner endangers the life of the other, or such as utterly destroys the legitimate ends and objects of matrimony, constitutes 'extreme cruelty' under the statutes, although no physical or personal violence may be inflicted or even threatened."

This rule is adopted practically *verbatim* by Mr. Keezer in his recent work on Marriage and Divorce, at section 112. Nelson on Divorce and Separation, speaking to the same point at section 251, says:

"Divorce for cruelty is not a remedy for incompatibility of tastes or temper, or for estrangements produced by differences of opinion and conduct; for these misfortunes do not endanger the health of mind and body, and must be endured with other minor misfortunes of life. The remedy of absolute divorce is an extraordinary remedy for evils which are unavoidable and unendurable and which cannot be relieved by any exertions of the party seeking the aid of the courts."

Our statute (section 15, art. 1, c. 59 [section 3774] Wilson's Rev. & Ann. St. Okla. 1903) provides:

"A husband is not bound to maintain his wife's children by a former husband; but if he receives them into his family and supports them, it is presumed that he does so as a parent, and where such is the case, they are not liable to him for their support, nor he to them for their services."

A stepfather, at common law, was not, merely by virtue of his marriage, under any obligations to support the children of his wife by a former husband. 29 Cyc. p. 1668. Nor was he, either at common law or under a statute similar to ours, required, merely by reason of the fact of his marriage to the mother, to receive into his home her children by a former husband. He is neither entitled to their custody nor to their earnings, and there is no reciprocal obligation to maintain them; but, where he does admit them into his family and assumes the relationship of parent, the reciprocal rights, obligations, and duties of parent and child attach, and continue as long as this relationship exists. *Englehardt v. Yung's Heirs,* 76 Ala. 534. Mistreatment of a stepchild in itself

alone will not afford grounds for a divorce. It is only where the cruelty towards the child is exercised with the intent of causing suffering to the parent that a cause of divorce on this account will arise. 1 Bishop on Marriage, Divorce and Separation, § 1586. Nelson on Divorce and Separation, § 301. In the case at bar there is very little, if any, evidence of any unkind treatment or cruelty toward the plaintiff's children, and no evidence that there was any design to thereby cause the mother suffering.

After a careful and painstaking consideration of the entire cause in all of its bearings, we are unable to sustain the judgment of the lower court, for the reason that the record is wanting in evidence reasonably tending to support it. The matters of which plaintiff complains in this action are not to our minds the character of actions on the part of a spouse calculated to meet the statutory requirements of extreme cruelty. The legislators have not defined the term, but have left it to the judgment and discretion of the courts, but they did say, as plainly as they could, that mere cruelty alone would be inadequate to constitute this ground, and that, where cruelty was relied upon, it must arise to the dignity of being extreme cruelty. The suffering engendered must not arise from supersensitiveness merely, but from an actual wrong done. We doubt not that the defendant in this action was at times surly, uncongenial, and disagreeable, and that he was indifferent what effect his deportment had upon the feelings of those about him, but such actions on his part would not constitute grounds for divorce. Marriage is not, in contemplation of law, consummated to exist merely so long as both parties are congenial and agreeable. It means more than that. People who enter matrimony do so always with more or less of a chance that their companion may be better or worse than they anticipate. It is the law that those who marry shall together meet at least the lighter burdens imposed by each upon the other incident to their inherent disposition and to life itself, and that each shall bear and forbear with the other, and it is only when the deportment of one is such that the marriage status is virtually destroyed, and its purposes

and objects gone, that the law will step in and give relief. In the case at bar the record discloses no substantial reason why these parties should not and cannot live together in accordance with the contract into which they entered. The plaintiff's children may not, over the objection of defendant, be forced into his household, and he should not be required to suffer this if they cause domestic discord between himself and wife; and, while defendant owes no legal duty to afford them a home or maintain them, if they deport themselves with reasonable regard for his rights and the new situation into which they and their mother find themselves, he should, from every moral standpoint, make an honest effort to accommodate them so long as they are immature and require it. If their presence renders his wife happy, and they do not by wilful conduct on their part destroy the harmony which ought to exist, he should make any reasonable concession to afford them a home. Nothing is disclosed by this record in the life of either of these people to make their reconciliation impracticable, and neither did any such condition arise or grow out of the trial. These things being true, and there being no evidence to support a divorce, there is a double reason to reverse this judgment and decree.

The cause is accordingly reversed and remanded to the district court of Pawnee county, with instructions to dismiss the same.

All the Justices concur.