## HILDEBRAND v. HILDEBRAND.

No. 3150. Opinion Filed December 23, 1913.

(137 Pac. 711.)

1. **DIVORCE—Grounds—"Extreme Cruelty."** Any unjustifiable conduct on the part of the husband, which so grievously wounds the mental feelings of the wife, or so utterly destroys her peace of mind, as to seriously impair her bodily health or endanger her life, or such as utterly destroys the legitimate ends and objects of matrimony, constitutes extreme cruelty within the meaning of the statute, although no physical or personal violence is inflicted or even threatened.

2. **SAME.** False and groundless charges of adultery with divers men, made at intervals during a long course of years, by a husband

against the wife, constitute extreme cruelty within the meaning of section 4962, Rev. Laws 1910.

3. **SAME—Amount of Alimony—Discretion.** Where a divorce is granted the wife by reason of the fault of the husband, the allowance of permanent alimony rests in the sound judicial discretion of the trial court, and is to be exercised with reference to established principles, and on a view of all the circumstances, such as the husband's estate and ability, at the time the divorce is granted, the wife's condition and means, and the conduct of the parties.

4. **SAME.** An allowance of alimony to the wife, of property approximating in value $10,000, where the remainder of the husband's estate, not considering life insurance policies maturing at various times in the future, is worth between $7,500 and $8,000, where the major portion in value of the property awarded the wife consists of a homestead acquired by the parties jointly during their marriage, and where the wife is given the care, custody, and control of two of the three minor children (the third and oldest child not being provided for in the decree), will not be disturbed on appeal as an unreasonable allowance.

(Syllabus by Sharp, C.)

*Error from District Court, Kay County;*
*W. M. Bowles, Judge.*

Action for divorce and alimony by Clara B. Hildebrand against E. A. Hildebrand. Judgment for plaintiff, and defendant brings error. Affirmed.

*W. K. Moore,* for plaintiff in error.

*John S. Burger,* for defendant in error.

Opinion by SHARP, C. The first, second, third, and fourth assignments of error involve either the legal sufficiency of plaintiff's petition, or the proof submitted in its support, and may therefore be considered together. The petition charged extreme cruelty in that defendant falsely and maliciously, and without grounds, accused plaintiff of having committed adultery with divers men, at divers times and places, during the last ten years preceding the filing of her petition. Other acts of cruelty, set forth in the petition, unnecessary to be here reiterated, together with the acts of cruelty mentioned, it was charged, caused plaintiff great suffering, mental anguish and pain, worry of mind, and great humiliation, with the result that her health was greatly im-

paired, and she was rendered almost insane. The facts charged were abundantly proved.

Defendant, a widower 40 years of age, married plaintiff, who was at the time of her marriage 21 years of age, at Matfield Green, Kan., on the 5th day of May, 1892. As a result of their union three children were born, aged at the date suit was brought, respectively, sixteen, thirteen, and eleven years. The first step in the family discord was when plaintiff visited her parents about three months after her marriage, and was falsely accused by her husband with having clandestinely met a gentleman acquaintance, though no criminal intimacy was in this instance charged. About two years after their marriage, they moved to Oklahoma, where defendant made homestead entry on a claim in Kay county. Shortly thereafter defendant became jealous of one James Patterson, who had called at their home on some neighborly errand. In 1902 defendant accused plaintiff of being criminally intimate with a hired hand, who was at the time in their employ. At the time defendant had left plaintiff at home sick in bed, with no one to attend her. He threatened to kill plaintiff on this occasion, if he could only be positive of her guilt. On account of defendant's said conduct on this occasion, plaintiff became melancholy, nervous, and physically ill. Plaintiff was also jealous of the local school-teacher, who occasionally called at the Hildebrand home to see the defendant, who was clerk of the school board. Joe Schmidt, a neighbor, was another of whom defendant was jealous. Dr. Elliott, at one time the family physician, was another toward whom he manifested much jealousy, charging plaintiff with having drunk whisky with him. Referring to a visit by plaintiff to her old home in Kansas, where for several months she was under a physician's care, she stated that:

"Mr. Hildebrand had just worn me out by sexual abuse, just completely worn me out, until I was forced to beg him to let me alone, and he would not do it, and I finally became hysterical and cried, and he called me a strumpet and said that while I had been at my old home I had been intimate with at least a dozen men and had spent that winter around the Old Central Hotel, and that he would not live with me again to save my soul from hell."

Wille Wildgrube, a neighbor boy, also came in for a share of his insane jealousies; with him he accused plaintiff of being unduly intimate.  Kelley Kersey and the Johnson boys were others toward whom defendant formed an aversion on account of his ungrounded suspicions.  On one occasion, when two. young men came to the home to call on a lady guest visiting them, defendant, upon his return, flew into a violent rage, broke a panel out of the door, and caused a disturbance.  Dr. Conway was another with whom defendant charged plaintiff with having had criminal relations, saying that he would bet that plaintiff had. slept with him 50 times.  Dr. Gearhardt was still another with whom plaintiff was charged with having been criminally inti-. mate.  The evidence shows not the slightest ground whatever for any of these brutal and indefensible charges.  They stand un-contradicted, save in the uncorroborated and very unsatisfactory evidence of the defendant himself.  Plaintiff, at the time of her marriage, was a school-teacher, and, the evidence unmistakably shows, a woman of some considerable refinement.  The effect upon her of these long years of continuous ill treatment is perhaps best told in her own language.  The day before the birth of one of her children, some question about what physician would be called arose.  She says that defendant assumed to be indignant at Dr. Elliott on some account, and said that he would show him that they did not need to have a doctor, and that "when I was taken sick on the 30th day of December, on a very cold night, we were alone and Mr. Hildebrand—well, I offended his sensibilities with my sickness, his olfactory nerves were so offended and he spoke to me so brutally that my heart was nearly broken, and I was obliged to go out in a cold room and stay there frequently for intervals of a half an hour, and it was so cold in there that water spilled on the floor was frozen, and it made my sickness unnatural, and I suffered a great deal, and when I cried he raised up and says, 'Well, for God's sake, what are you bellering for?' he says, 'if you can't sleep, there isn't any reason why you should keep the whole house awake;' and after that of course I stifled my groans until after daylight."  Harry was born the next afternoon, no physician being sent for during her labors.

On another occasion, while plaintiff was confined to her bed with illness, a neighbor boy dropped in to inquire of her condition.: The conduct of defendant when he learned of this fact is explained by plaintiff thus wise:

"When Mr. Hildebrand found out, he doubled up his fist and shook it in my face, oh well, within a half an inch of my eyes. I thought he was going to strike me, and still he would not have made— Q. State what he said. A. Well, he said that if—the first time he met that God damned son of a bitch, he was going to walk up to him and strike him between the eyes, he didn't care if he knocked him dead; he wouldn't even listen to my explanation about him not being there—he walked out the door and slammed it after him, and then a short time after that a deputy came from Ponca City to attach some property of ours and sell it for a debt, and Mr. Hildebrand—I was still sick in bed and couldn't get up—Mr. Hildebrand said he was going away, he hitched up and was getting ready to drive away, and he came to the door and he says, 'If that damn deputy comes out there to-day to sell these hogs,' he says, 'don't you let him step his foot on this place.' I said, 'Well, papa, how can I help myself?' He says, 'You can go to hell then,' and he went that way."

Referring to the birth of the youngest son, the witness testified:

"The next sickness that I remember was when my boy—after my boy Richard came, my youngest son, and I sent for my sister Ruby to help me and it was always the same trouble about the smoke, and he never gave me even a kind word. He would speak about the dirt and things weren't clean enough, and I laid around in the dirt like a shoat; if I looked bad, he said I looked like a cow that had lost her calf; that is the kind of remarks he made to me all the time; and my house was just barren of everything. We had been in Oklahoma long enough to begin to get things; we had raised some good crops and had money, but it all had to go to pay old debts. I didn't even have clothes, and I didn't go to town more than twice a year to buy anything. If I did, he didn't give me any money to buy anything."

On five occasions, when plaintiff was ill, caused by miscarriages, defendant would say that he didn't believe there was anything the matter with her, and if there was, "It didn't belong to him."

It was shown that for over ten years plaintiff had charge of the farm, defendant spending all of his time, except Saturday nights and Sundays, in Ponca City, where he was engaged in the telephone business.   Since moving to Oklahoma, plaintiff had done almost all kinds of manual labor, such as painting the house, inside and out, herding the cattle, shoveling wheat, gardening, and cleaning out the stable, and had contributed largely toward their property accumulations.   During all of this time plaintiff, on account of defendant's conduct, was ostracized by her neighbors, and had no social companionships, but patiently bore the studied insults and imprecations heaped upon her by her husband, who for ten years, save from Saturday night until Monday morning, made his home at the leading hotel in Ponca City, and traveled during the latter years in an automobile, while his wife performed her menial labors on the farm.   As stated by plaintiff:

· "So far as my relations with my husband have been concerned, it has been one long bitter period of just misery for something like fifteen or sixteen years."

Much more evidence, some of which is even more damning than that mentioned, was produced at the trial.   It was shown that defendant repeatedly stated that he cared nothing for his wife or their three children, and that when he married her he needed a home and a housekeeper, and picked plaintiff out from among the other girls of Matfield Green for that purpose.

Does the petition charge, and does the evidence show, extreme cruelty, within the meaning of our divorce statute (section 6172, Comp. Laws 1909; section 4962, Rev. Laws 1910)?   The law at one time required proof of physical violence where extreme cruelty was relied upon as a ground for divorce; but the later and better considered cases have repudiated this doctrine, as taking too low and sensual view of the marriage relation, and it is now very generally held that any unjustifiable conduct on the part of either spouse, which so grievously wounds the mental feelings of the other, or so utterly destroys the peace of mind of the other, as to seriously impair the bodily health or endanger the life of the other, or such as utterly destroys the legiti-

mate ends and objects of matrimony, constitutes extreme cruelty under the statute, although no physical or personal violence be inflicted or even threatened. *Beach v. Beach,* 4 Okla. 359, 46 Pac. 514; *Barker v. Barker,* 25 Okla. 48, 105 Pac. 347, 26 L. R. A. (N. S.) 909; *Lyon v. Lyon,* 39 Okla. 111, 134 Pac. 650; *Gibbs v. Gibbs,* 18 Kan. 419; *Carpenter v. Carpenter,* 30 Kan. 712, 2 Pac. 122, 46 Am. Rep. 108; *Avery v. Avery,* 33 Kan. 1, 5 Pac. 418, 52 Am. Rep. 522; *Masterman v. Masterman,* 58 Kan. 748, 51 Pac. 277; *Rowe v. Rowe,* 84 Kan. 696, 115 Pac. 553.

False charges of adultery, made by the husband of the wife maliciously and without probable cause, constitute legal cruelty. To a pure and virtuous woman, in no way could a husband show his cruelty and inhumanity more completely than by false and unfounded charges of a want of chastity; and, where the charges are repeated and continued for a long term of years, and embrace many alleged facts of adultery, which, if true, would make the wife a being little better than a common prostitute, the offense is aggravated almost beyond the pale of human forgiveness. When a husband descends to such a level, and becomes so vicious and depraved, and so completely forgetful of the sanctity of the marital relation, then indeed, in his case, the institution of matrimony fails. The law does not require that a good woman further continue to cohabit with such a type. Human law requires no such sacrifice, and the fact that defendant did not use a bludgeon will not enable him to defeat the wronged wife, in a suit for legal separation and alimony. Blows often wound less deeply than words, and in this age of Christian civilization when the wife is not as a beast of the field, but instead the queen of the home, she is entitled of right to the husband's unfaltering love and respect, and where this is denied her, where there is sufficient evidence, to the protection of the courts. We find little patience with the insistence of the once semibarbaric rule that afforded an avenue of escape to the injured wife only where physical violence was inflicted upon her. *Beach v. Beach,* 4 Okla. 359, 46 Pac. 514; *Barker v. Barker,* 25 Okla. 48, 105 Pac. 347, 26 L. R. A. (N. S.) 909; *Mathewson v. Mathewson,* 81 Vt. 173,

69 Atl. 646, 18 L. R. A. (N. S.) 300, and note; *Miller v. Miller,* 89 Neb. 239, 131 N. W. 203, 34 L. R. A. (N. S.) 360, and note; *MacDonald v. MacDonald,* 155 Cal. 665, 102 Pac. 927, 25 L. R. A. (N. S.) 45; 14 Cyc. 606.

The findings of the court are that the allegations in plaintiff's petition are true. These allegations assign extreme cruelty as a ground of divorce, and on appeal we are not concerned with the reason given for reaching the correct conclusion. The petition sufficiently stated a good cause of action, and was supported by the great preponderance of the evidence. The court could not have done otherwise than to find in favor of the plaintiff.

Finally, it is urged that the court erred in its decree awarding alimony in property valued at over $10,000. The statute authorizing an award of alimony (section 4969, Rev. Laws 1910) provides that when a divorce shall be granted by reason of the fault or aggression of the husband, the wife shall be allowed such alimony out of the husband's real and personal property as the court shall think reasonable, having due regard to the property which came to him by marriage, and the value of his real and personal estate at the time the decree is rendered, which alimony may be allowed to her either in real or personal property,. or both. The plain letter of the statute, therefore, gave to the trial court the right to make such an award as it thought reasonable in the light of the evidence adduced. The rule announced is in full harmony with the very general rule that the allowance of permanent alimony is a matter of sound judicial discretion, to be exercised with reference to established principles, and upon a view of all the circumstances of each particular case; such as the estate and ability of the husband, the condition and means of the wife, and the conduct of the parties. *Adams v. Adams,* 30 Okla. 327, 120 Pac. 566; *Viertel v. Viertel,* 212 Mo. 562, 111 S. W. 579; *McConnell v. McConnell,* 98 Ark. 193, 136 S. W. 931, 33 L. R. A. (N. S.) 1094; *Huffman v. Huffman* (Ind. App.) 101 N. E. 400; *Call v. Call,* 65 Me. 407; *Winkler v. Winkler* (Miss.) 61 South. 1; *Wyrick v. Wyrick,* 88 Neb. 9, 128 N. W. 662; *McCarthy v. McCarthy,* 143 N. Y. 235, 38 N. E. 288; *Blair*

*v. Blair* (Utah) 121 Pac. 19, 38 L. R. A. (N. S.) 269; *Harris v. Harris,* 31 Grat. (Va.) 13.

The evidence showed that the value of the farm on which plaintiff resided, and had charge of for ten years, was between $9,000 and $10,000. Other property covered by the decree amounted in all not to exceed $1,000 additional. The defendant was the owner of dividend paying stock in the American Telegraph & Telephone Company of the value of approximately $5,000, in addition to which he had about $1,000 on deposit in a bank, and owned real estate in Oklahoma City, Ponca City, and Braman, worth approximately $1,400, and life insurance policies amounting to $5,000, one policy for $1,000 maturing the year following the trial, one one or two years later, and the others having some time to run. He also owned an automobile, and was drawing a salary from the Pioneer Telephone & Telegraph Company of $75 per month. The decree gave to the plaintiff the care, custody, and control of the two younger children, Harry and Richmond; and, considering this fact and the further fact that plaintiff by her long years of arduous labor had contributed largely to the property accumulations, we think that no abuse of discretion in the matter of fixing the amount of the alimony is made to appear.

The judgment of the trial court should be affirmed.

By the Court: It is so ordered.